UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| VALLAMBROSA HOLDINGS, LLC, *et al.,* | ) CHAPTER 11 |
| | ) CASE NO 08-40791 |
| Debtor. | ) (Jointly Administered with |
| | ) Case No. 08-40990-LWD) |
| Tax I.D. No. 20-1330863 | ) |
| | ) |
| | ) |
| CANPARTNERS REALTY HOLDING, | ) |
| COMPANY IV, LLC, | ) |
| | ) |
| Movant, | ) |
| | ) CONTESTED MATTER |
| v. | ) |
| | ) |
| VALLAMBROSA HOLDINGS, LLC, | ) |
| | ) |
| Respondent. | ) |

**CANPARTNERS REALTY HOLDING COMPANY IV LLC'S
SECOND EXPERT WITNESS DISCLOSURE**

Canpartners Realty Holding Company IV LLC ("Canpartners"), by and through its

undersigned counsel, hereby gives notice of its disclosure of the following additional expert

witness in this matter:

1.      Canpartners intends to use the expert witness testimony of the following:

Richard Gaudet
GlassRatner Advisory & Capital Group LLC
3391 Peachtree Road, NE, Suite 110
Atlanta, Georgia 30326

2.      Mr. Gaudet will render opinions concerning the availability of financing in the

Savannah, Georgia market – the location of the subject property at issue in this litigation (the

"Property"), the terms of any such financing, the provisions and feasibility of the Debtor's

{O1350684;1}

Chapter 11 Plan, and matters pertaining to the use and development of the Property as such use and development relate to the availability of financing.

3.    Mr. Gaudet's written Expert Report (the "Report"), which will be offered in support of Mr. Gaudet's expert testimony, is attached hereto as Exhibit A.  A copy of the Report was provided to counsel for the Debtor on December 29, 2008.[1]

4.    The Report contains (i) a complete statement of all opinions Mr. Gaudet will express and the basis for such opinions; (ii) the data and other information considered by Mr. Gaudet in forming his opinions identified in the Report; (iii) the exhibits Mr. Gaudet will use to summarize or support his opinions; (iv) Mr. Gaudet's qualifications; (v) a listing of all other cases during the previous four (4) years in which  Mr. Gaudet has testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for Mr. Gaudet's study and testimony in this case.

5.    Mr. Gaudet has not authored any publications in the past ten (10) years.

Dated this 30th day of December, 2008.

> Respectfully submitted,
>
> /s/ Denise D. Dell-Powell
> Denise D. Dell-Powell, Esq.
> Georgia Bar No. 217070
> **AKERMAN SENTERFITT**
> 420 South Orange Avenue, Suite 1200
> Orlando, Florida 32802
> Telephone: (407) 423-4000
> Fax: (407) 843-6610
> Email: Denise.DellPowell@akerman.com
>
> and
>
> Kathleen Horne, Esq.
> Georgia Bar No.: 367456

---

[1] While the undersigned made several attempts to file this disclosure and the attached Report with the Court on December 29, 2008, the undersigned was not able to do so because there were technical difficulties with the site which prevented the docketing and recording of papers.

{O1350684;1}

**INGLESBY, FALLIGANT, HORNE,
COURINGTON & CHISHOLM, P.C.**
17 W. McDonough Street
Savannah, GA 31402
Telephone: (912) 232-7000

**ATTORNEYS FOR CANPARTNERS REALTY
HOLDING COMPANY IV LLC**

## CERTIFICATE OF SERVICE

This is to certify that I served the attached, "Canpartners Realty Holding Company IV

LLC's Second Expert Witness Disclosure," on December 29, 2008 by electronic mail, and on

December 30, 2008 by U.S. Mail, to:

JAMES L. PAUL, ESQ.
JOHN K. REZAC, ESQ.
Chamberlain, Hrdlicka, White, Williams & Martin
191 Peachtree Street, N.E., 34th Floor
Atlanta, Georgia 30303

JAMES L. DRAKE, JR., ESQ.
P. O. Box 9945
Savannah, GA 31412

/s/ Denise D. Dell-Powell
Denise D. Dell-Powell, Esq.



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

**In Re: Vallambrosa Holdings, LLC**

**Expert Report**
**of**
**Richard Gaudet**
**GlassRatner Advisory & Capital Group, LLC**

**December 29, 2008**



Exhibit A

3391 Peachtree Rd., NE, Suite 110 | Atlanta, GA 30326 | Tel: 678.904.1990 Fax: 678.904.1991 | www.glassratner.com



# Table of Contents

**Tab**

1    **Report**

2    **Appendices**

    Appendix A    – Documents Relied Upon

    Appendix B    – Curriculum Vitae of Richard B. Gaudet

    Appendix C    – Testimony of Richard B. Gaudet



# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| **IN RE:** | |
| **VALLAMBROSA HOLDINGS, LLC,** | **CHAPTER 11** |
| **Debtor.** | **CASE NO. 08-40791-LWD** |
| **Tax I.D. No. 20-1330863** | |

**Expert Report of Richard Gaudet**
**GlassRatner Advisory & Capital Group, LLC**
**dated**
**December 29, 2008**

### I.      Introduction and Summary Conclusion

GlassRatner Advisory & Capital Group, LLC ("GlassRatner") was retained by Akerman Senterfitt on behalf of Canpartners Realty Holding Company IV, LLC ("Canpartners") to review the Chapter 11 Plan of Reorganization of Debtor Vallambrosa Holdings, LLC dated August 4, 2008 (the "Plan"). Specifically, we were asked to analyze and opine on the feasibility of Cramdown Alternative One and Cramdown Alternative Two, as proposed in the Debtors Plan. It is our opinion that the proposed Plan is not viable from either a market or financial perspective.

### II.      Scope of Work

During the course of our work, we reviewed certain pleadings and documents produced as listed in the footnotes to this letter report and Appendix A. In addition we relied on our past experience, education and training, all of which are typically relied on in matters such as this. We reserve the right to update this report and perform further analysis should we be asked to or additional information becomes available. Specifically, since the Debtor's Plan does not provide detail as to the intended use of the proceeds of the Infrastructure Development Loan or the proposed development plan for the property, we relied on incomplete and contradictory

information in the completion of this report.  As such, our final opinion may require revision once the development plan and budget are presented.

### III.    Background

Current General Market and Economic Conditions
Since the middle of 2007, the secondary market for mortgage loans of all types, especially for "distressed" loans, has been in disarray. The rapid rise in residential mortgage delinquency and default levels triggered massive dislocations in the securitization markets, and the contagion has spread to multifamily and commercial loans and to United States real estate markets in general. The effects throughout the capital markets worldwide are well documented:

- Thousands of commercial and residential MBS and CDO bonds have been downgraded, and the rating agencies which originally rated those bonds are under intense scrutiny and heavy criticism.
- The monoline insurers which insured the bonds have been forced to raise substantial additional capital and are themselves at risk for possible downgrade.
- Hedge funds, investment banks, commercial banks and other institutional investors which purchased those bonds have recognized massive losses on both loans and mortgage-backed securities in their portfolios.
- Hundreds of local and regional banks, which had provided financing to commercial and residential real estate developers in the booming economic environment of 2002-2007, are now carrying on their books large quantities of loans (many nonperforming) secured by uncompleted development projects or even raw land. Most of the borrowers of those loans are in financial distress, so collectability is doubtful.

Attempts by the Federal Reserve Board to restore some semblance of normalcy to this market have been largely ineffective to date. Despite several reductions in the Fed Funds and discount rates, the market for mortgage-backed securities has not returned. Instead, the spread between LIBOR (to which most adjustable-rate mortgages are indexed) and the Fed Funds Rate has widened. Pricing for most ABX indices (a series of credit-default swaps which sophisticated traders use to hedge implicit risk in mortgage-backed securities) is at or near historical lows, and the prices for most BBB- indices (the lowest credit grade, which is a proxy for the residual interests in these vehicles) has decreased by nearly 70% over just the last nine months.

The Vallambrosa Project
Vallambrosa is a land development company formed by Jewett W. Tucker, Jr. ("Tucker") in 2006 to develop an 8,210[1] acre development tract (the "Property" or the "Vallambrosa Project") annexed to the City of Savannah between 2003 and 2008.[2]  Prior to the formation of Vallambrosa, the development of the land commenced with the addition of water and sewer lines[3] funded through traditional bank financing and the sale of sub-parcels with repurchase options.[4]  In 2006, Canpartners was approached by Tucker to provide certain financing of the Property.[5]  Canpartners agreed to provide the funds under the requirement that the Property be placed under a single owner[6] leading to the formation of Vallambrosa.    Ultimately, on September 29, 2006, Canpartners loaned Vallambrosa $28 million as set forth in the Promissory

---

[1] Approximately 8,210.196 per the Plan, p. 1.
[2] Plan, p. 2.
[3] Plan, p. 2.
[4] Plan, p. 2.
[5] Plan, p. 4.
[6] Plan, p. 4

2

Note executed between the Parties.[7]    Tucker was the guarantor on the Loan and related Promissory Note.[8]

In early 2008, Canpartners commenced foreclosure on the Vallambrosa Project.[9] On May 5, 2008, Vallambrosa filed a petition under Chapter 11 of the U.S. Bankruptcy Code.[10] Canpartners holds a secured claim against the Debtor, claimed in the amount of the $28 million principal amount lent on the Note plus accrued and unpaid interest and penalties (the "Canpartners' Secured Claim").[11]   Canpartners may also hold an unsecured claim for deficiency if the secured claim is found to be under secured (the "Canpartners' Unsecured Claim").   On August 4, 2008, Vallambrosa submitted its Plan to the Court in which the Debtor stated that Canpartners' Secured Claim is impaired and has set forth a "cram down" Plan if the Parties are unable to reach a settlement with regard to Canpartners' Secured Claim.[12]   Furthermore, the Debtor states that Canpartner's Unsecured Claim may also be impaired.[13]


## IV.    GlassRatner Analysis and Findings

The proposed Debtor Plan provides three potential alternatives:

  1)    the Settlement Alternative in which the Debtor and Canpartners mutually consent to the treatment of the Canpartners claim;[14]

  2)    Cramdown Alternative One[15] in which the Debtor:
      a. Obtains Priming Infrastructure Development Loan to support the completion of infrastructure improvements and at least 60 building lots;
      b. Obtains an easement from adjacent property owners for a connector road to Highway 17;
      c. Obtains consent of the City of Savannah for funding of the construction of the Highway 17 connector road;
      d. Completes sales of developed lots and/or Development Parcels sufficient to repay the Infrastructure Development Loan and the Canpartners claim within 24 months, or
      e. At the end of 24 months conducts an auction of sufficient remaining collateral to satisfy the Canpartners Claim.

  3)    Cramdown Alternative Two[16] in which the debtor relies upon values determined by the Court to satisfy all or some portion of the Canpartners claim through the grant of deeds in lieu of payment on certain tracts of land.

Since the Settlement Agreement scenario is outside of the scope of our engagement, this analysis assumes that no settlement agreement is reached, leaving the Cramdown Alternatives as the remaining alternatives.

---

[7] Plan, pp. 4 -5 and 7.
[8] Loan Agreement dated September 29, 2006 by and between Vallambrosa Development Company, LLC and Canpartners Realty Holding Company IV, LLC (the "Loan"), p. 5
[9] Plan, p. 9.
[10] Plan, p. 17.
[11] Canpartners Proof of Claim.
[12] Plan, Section 5.2, pp. 26-40.
[13] Plan, Section 5.5, pp. 42-43.
[14] Plan, pp. 28 - 29
[15] Plan, pp. 29 - 39
[16] Plan, pp. 39 - 40

In reviewing the feasibility of these alternatives, we focused on the risks associated with the Alternative. These risks can be divided into two classes, Market Risk and Financial Risk. The Market Risk focuses on the likelihood that the Debtor can achieve the forecasted performance from the perspective of absorption and valuation. The Financial Risk focuses on the likelihood that the proposed Plan will provide sufficient financial return to attract capital (in the form of debt or equity) in today's financial environment.

Market Risk

The Plan does not provide sufficient detail in regard to expected sales velocity or value to support an analysis of the expected market risk. The Plan does provide that during the proposed two-year period would develop and presumably sell at least 60 lots, as well as potentially sell Development Parcels.[17] In support of these proposed sales levels, the Debtor has provided an appraisal by Joseph J. Blake and Associates, Inc. dated September 10, 2008 (the "2008 Blake Appraisal"). This appraisal utilizes a Subdivision Sellout Analysis to derive an "as is" value of the subject property of $50,300,000,[18] assuming completion of the Highway 17 connector road.[19] At the core of this appraisal is the assumption that the subject property will be improved over the next 24 months, with amenities that will dictate certain pricing on developed lots costing in excess of $31 Million.[20]

The Blake 2008 Appraisal utilizes many assumptions in determining Projected Lot Prices that we believe to be either unwarranted or unsupported. The following provides a listing of some of these assumptions:

- Lot Sale Comparables do not provide a sale date, but are believed to rely heavily upon sales that occurred during the period prior to September 2007. Our experience has shown that the residential real estate market began to decline in early to mid 2007 with the collapse of the sub-prime and "Alt-A" financing markets. This decline continued at a steady pace throughout 2008, and accelerated significantly in the fourth quarter of 2008 following the broad based decline in the overall economy.

- Prior to the 4th quarter of 2008, much of the product delivered into the developed lot market, as well as the speculative home market, was driven by completion and delivery of projects that began prior to the market decline. In other words, the market continued to deliver inventory for some period after the demand ceased, resulting in excessive inventory levels of developed lots and raw land. With excessive completed inventory of speculative, foreclosed and re-sale single family product, the demand for developed lots and raw land has virtually ceased and is not expected to return until the inventory levels are reduced to reasonable levels.

- Lot Sale Comparables utilized several projects that are outside of the Savannah MSA, have significantly superior amenities, or are targeted toward second homebuyers. In our experience, each of these factors present significant issues.
  - The Hilton Head/Beaufort Market has been severely impacted by the housing boom and subsequent fall to the point that pre-2008 values in that market are completely moot in current valuations.
  - Likewise, the second home market has been severely impacted by the disappearance of the "Alt-A" financing market as well as the general downturn in the economy.
  - Finally, we have found that in the current market environment, the expected delivery of future amenities does not add to the marketability or expected sale price of a given property. Buyers have valid concern over the ability of

---

[17] Plan, p. 30
[18] 2008 Blake Appraisal, p. 174 and p. 179
[19] 2008 Blake Appraisal, p. 12
[20] 2008 Blake Appraisal, p. 172

any developer to generate sufficient sales velocity to support construction of amenities and as such, will substantially discount offers on properties that do not have self supporting and well funded amenities in place at the time of purchase.

- The average forecasted lot price of $408,930[21] is excessive, given the most reasonable comparables of Westbrook at Savannah Quarters[22] and Ford Plantation.[23]

- The proposed price point appeals to a very small percentage of the Savannah MSA population given household income data provided in the Blake 2008 Appraisal.[24] The limited market for the suggested price points makes the anticipated absorption of 100 lots/year (50 lots/year in the case of an 800 lot development)[25] suspect and likely unachievable.

- The 25% upward density adjustment[26] appears to be based heavily on the fact that Ford Plantation home sites are generally of larger size but ignores the fact that the comparables with similar size lots, such as Westbrook at Savannah Quarters do not enjoy such premiums for higher density.

- The DCF utilized by the Blake 2008 Appraisal assumes appreciation in lot prices of 6% per annum,[27] which is based on average lot appreciation during the 2003 – 2005 timeframe, a period in which the appraiser acknowledges that the market was overheated.[28] The appraisal ignores the fact that lots have shown significant decline in value since this period and that the future will, in all likelihood, show further decline in these values given an expectation of lower land costs and more competitive pricing of development costs as excess inventory is consumed.

In summary, the Plan carries a high degree of Market Risk in that the execution of the Development Plan, delivery and sale of the proposed inventory in accordance with the Blake 2008 Appraisal relies on highly optimistic assumptions as to the velocity and value of anticipated sales. The Market Risk is further challenged since the Plan does not contemplate being able to achieve the performance anticipated by the Blake 2008 Appraisal.

<u>Financial Risks</u>

As referenced above, the Financial Risk of the Plan focuses on the likelihood that the proposed Plan will provide sufficient financial return to the vested parties.  In reviewing the financial risk associated with the proposed Plan, Creditors will assess the risk adjusted return on the proposed Plan, relative to other available alternatives.  Specifically, Creditors should focus this analysis on the quality of the primary repayment source, which is purported to be the development and sale of Developed Lots and/or Development Parcels in accordance with a Master Development Plan[29] as contemplated by the Blake 2008 Appraisal (subject to the inconsistencies discussed above between the Plan and the Blake 2008 Appraisal assumptions).

Two key factors in determining the quality of a given repayment source are stability of expected repayment proceeds and timing of repayment.  Credit risk is measured as a factor of two components: 1) Probability of Default (PD) and 2) Loss Given Default (LGD).  The Probability of Default is directly related to the primary repayment source of a given loan while the Loss Given Default is most directly related to the strength of the secondary repayment source(s) of the loan.

---

[21] 2008 Blake Appraisal, p. 122 and p. 176
[22] 2008 Blake Appraisal, pp. 59 - 62
[23] 2008 Blake Appraisal, pp. 68 - 71
[24] 2008 Blake Appraisal, p. 24
[25] 2008 Blake Appraisal, p. 167
[26] 2008 Blake Appraisal, p. 118
[27] 2008 Blake Appraisal, p. 167
[28] 2008 Blake Appraisal, p. 37 - 43
[29] 2008 Blake Appraisal p. 3

Under the proposed Plan, the primary repayment source is the development and sale of lots and the sale of Development Parcels over a 24-month period.[30]  Given the issues discussed under Market Risks, this primary repayment source is believed to be weak.  This weakness is further evidenced by the fact that there is currently no lender appetite for long term, large-scale acquisition and development ("A&D") financing.   Conventional regulated lenders are under regulatory pressure to reduce exposure to residential A&D projects, both in whole dollars and as a percentage of the total loan portfolio.  Non-regulated lenders are providing some degree of backstop for this market, but typically at loan to value levels and financing costs that make the projects financially infeasible.  Many entities have formed recently for the purpose of providing equity investment for distressed A&D projects, but even these new market entrants are having trouble finding projects that support their extremely conservative timing estimates and their high return expectations.  In short, there is a total lack of financing availability for large-scale A&D projects in the current market.  The proposed Plan ignores the fact that the entire real estate developer, investor, and lender community has determined that current investment in residential acquisition and development is unwise.

In supporting the primary repayment source, the Blake 2008 Appraisal ignores the current market dynamics, possibly because of its reliance on older comparables or merely the fact that it did not anticipate the continued market decline that has occurred since the appraisal date. The Subdivision Sellout Analysis[31] utilizes a hybrid approach to real estate valuation, which combines the traditional "Market Approach" and "Income Approach" Valuation methods.  While commonly used in recent years to support acquisition and underwriting of land acquisition, this valuation method has shown weakness in the current market due to the reliance on rigid execution of development, delivery and sale of inventory in order to validate the expected Internal Rate of Return ("IRR") that drives the valuation methodology.  As with any IRR driven financial model, this valuation method is extremely sensitive to timing of expected cash flows. Buyers of developed lots and raw land in today's market are more inclined to use extremely conservative assumptions as to the expected absorption of acquired land and lot inventory.  For example, recent discussions and transactions with buyers of distressed real estate secured debt as well as fee simple real estate indicate that buyers are typically using assumed hold periods in excess of three years for developed lots and in excess of five years for raw land.  Additionally, in spite of these conservative holding periods, the buyers in today's market are currently targeting an unleveraged IRR in the 27.5% to 30% range.  In summary, the 2008 Blake Appraisal appears to overstate the likely absorption and understate the investor IRR that a buyer of the project would likely expect, thus overstating the value of the property and the viability of the primary repayment source.

To demonstrate the volatility of the subdivision sellout method of valuation, consider that the DCF utilized by the appraisal assumes the expenditure of $31,250,000 for amenities such as a golf course, clubhouse, trails and playgrounds that would support the premium pricing for certain lot views,[32] but the Plan indicates no such Planned development.  On the contrary, the Plan assumes the development of only 60 initial lots and sale of Development Parcels, presumably to third party developers.[33]  A key assumption of the Blake 2008 Appraisal is the timely development of the project in accordance with a Planned Unit Development (PUD),[34] but the Debtor's Plan does not dictate or forecast compliance with this development methodology. As such, the discounted cash flow model, which derives the value, is flawed from the outset because cash flows in terms of development expenditures and forecasted lot pricing cannot materialize under the proposed Plan.

---

[30] Plan, pp. 29 - 30
[31] 2008 Blake Appraisal, pp. 171 - 178
[32] 2008 Blake Appraisal, p. 172
[33] Plan, p. 30
[34] 2008 Blake Appraisal p. 2

Beyond the weakness of the primary repayment source, the proposed Plan actually weakens the secondary repayment source, which is the sale of the collateral in an "as is" state. Based on the Blake 2008 Appraisal, the highest and best use of the project is for development under the proposed PUD, including the development of proposed amenities.[35]  In spite of this, the Plan provides for the sale of the collateral as Development Parcels or through auction under Cramdown Alternative One, or as Deeds in Lieu on certain tracts under Cramdown Alternative Two.[36]  Either of these liquidation methods carries the risk of upsetting the highest and best use of the project.  This is particularly true in a project that purports to be amenity dependant.  While the scale of proposed amenities may be viable for the total project, the likelihood of having several property owners consent to, or participate in, the funding and construction declines significantly as new owners are introduced.


## V.      Opinion of Richard B. Gaudet

Based on the analysis above, my experience and training in matters such as this, it is my opinion that the proposed Plan is not viable from either a market or financial perspective.  The debtor's assumptions as to absorption and lot pricing are significantly in excess of what the current market will support.  Additionally, the ability of the debtor to secure commitments for the proposed easements and City funding for the Highway 17 connector are not validated in the Plan.  Most significantly, the Plan ignores the current state of the market for residential development, the pressures faced by lenders, and the demands of equity investors.

In my opinion, approval of the proposed Plan will result in a failure of the primary repayment source and diminution in value of the secondary repayment source, thus reducing the expected recovery to the creditors of the estate.


## VI.     Qualifications

Mr. Gaudet is a Senior Managing Director with GlassRatner Advisory & Capital Group, LLC, a specialty financial advisory firm located in Atlanta, Georgia.  He has over 25 years of commercial banking experience including commercial, asset based, real estate and consumer lending as well as underwriting, credit analysis, credit risk review, portfolio management, due diligence and business refinancing.  Mr. Gaudet has managed complex real estate and commercial problem assets, and has lead GlassRatner's activities as financial advisor to the Federal Deposit Insurance Corporation in recent loan sale engagements involving portfolios of commercial and residential real estate development and construction loans. Additionally, Mr. Gaudet is actively advising clients throughout the Southeast with active residential and commercial developments having debt exposure in excess of $5 Billion.  Mr. Gaudet also provides advisory services to community banks in the area of commercial and real estate underwriting, loan review, capital adequacy Planning, and preparation for FDIC examinations.  Mr. Gaudet's Curriculum Vitae is included as Appendix B.  A summary of Mr. Gaudet's prior testimony is attached as Appendix C.

---

[35]  2008 Blake Appraisal, pp. 129 - 130
[36]  Plan, pp. 29 - 40

## VII.   Fees

Mr. Gaudet's fees for this matter have been billed based on actual time incurred at the rate of $345 per hour. Others assisting him on this engagement were also billed based on actual time incurred at rates ranging from $135 to $345 per hour.


Richard Gaudet
GlassRatner Advisory & Capital Group, LLC

December 29, 2008
Date

# Appendix A

**Documents Relied Upon**



1. Chapter 11 Plan of Reorganization of Debtor Vallambrosa Holdings, LLC Dated August 4, 2008

2. Chapter 11 Disclosure Statement of Debtor Vallambrosa Holdings, LLC Dated August 4, 2008

3. Loan Agreement Dated as of September 29, 2006

4. Appraisal of The Proposed Vallambrosa Plantation Subdivision Located at The Southwest Corner of CSX Railroad Line and Chevis Road, North of the Ogeechee River Savannah, Chatham County, Georgia 31419 Dated September 10, 2008. Prepared by Joseph J. Blake and Associates, Inc.

5. Proof of Claim Filed in Bankruptcy Case 08-40791 by Canpartners Realty Holding Company IV, LLC Dated September 9, 2008

# Appendix B



# Richard B. Gaudet – Curriculum Vitae

3391 Peachtree Rd, NE
Suite 110
Atlanta, Georgia 30326

404-835-8860
rgaudet@GlassRatner.com

## PROFESSIONAL EXPERIENCE

**GlassRatner Advisory & Capital Group** – Atlanta, GA                 **2004-Current**
*Senior Managing Director*
Manages a broad based financial advisory practice providing the following services to a wide range of clients:

- Settlement/restructure negotiations with banks, trade creditors, and the Internal Revenue Service
- Bankruptcy advisory, representing both debtors and creditor committees
- State court receivership
- Assignment for the benefit of creditors
- Sell side and buy side merger and acquisition
- Distressed debt acquisition and servicing
- Sale of distressed debt
- Corporate liquidations
- Dispute resolution

Having represented both debtors and creditors in complex negotiations, Richard understands the goals of both parties in a negotiation and is able to quickly bring the parties to an amicable and workable agreement.

**Wachovia Bank, N.A.** – Atlanta, GA                 **1991-2004**
*Manager Special Assets*
Managed special assets department with emphasis on credit quality improvement, loss

mitigation and client retention.  Consistently delivered resolution and efficiency rates above the corporate average.

- Criticized asset resolutions of over $1 Billion with net losses of under $35 Million.
- Client retention rate of 65% on commercial accounts in excess of $5 Million.
- Lowest average overhead ratio in the corporation with average cost of resolution per asset of under $1,000.
- No employee turnover versus a division average of 12% per annum.
- Managed non-loan defensive litigation resulting in settlement of several complex claims totaling over $100 Million with total settlement costs of under $5 Million.
- Developed departmental expertise to offer consultation to line bankers in a wide range of areas including cash management, securitized lending, probate, and non-conventional loan structuring.
- Instituted a proactive approach for early identification of problem accounts which enabled Special Assets to become involved in the early stages of a problem, thus improving the probability that relationships could be salvaged rather than liquidated.

### *Business Process Analyst, 1995-1997*
Temporary assignment assisting in the design, development and successful deployment of a client server software application for use by special assets officers in the management of problem loans and OREO.  The intuitive nature of the system resulted in subsequent enhancement and adoption as the primary underwriting and portfolio management system of the commercial bank.

### *Special Assets Officer, 1991-1995*
Responsible for the successful collection, renegotiation, rehabilitation and/or liquidation of commercial, asset based, and real estate loans.  Additional responsibilities included the management of a $20 Million portfolio of charged off commercial loans and acting as bulk sale coordinator of four sales totaling $200 Million.

### PROFESSIONAL EXPERIENCE (continued)

HIBERNIA NATIONAL BANK – Baton Rouge, LA                          **1984-1991**

### Special Assets Officer, 1985-1991

Managed a Special Asset portfolio with emphasis on commercial loans and residential real estate developments. Additional responsibilities included the formation and administration of a residential construction loan department; co-chairmanship of the special asset division loan committee; membership on the real estate, commercial and senior loan committees; development of an asset based lending policy and residential construction lending policy; and part time membership on the merger and acquisition team.

### Loan Review Officer, 1985

Annual review and risk rating of commercial and real estate loans and developed and implemented a loan officer assessment program which analyzed overall quality, profitability, industry and collateral concentrations, and policy compliance of specific portfolios within the bank.

### Commercial Loan Analyst, 1984-1985

Provided assistance to commercial and real estate loan officers in the underwriting and preparation of loan packages for credit requests in excess of $1 Million. Formal credit training was provided under the bank's loan officer training program.

## MILITARY EXPERIENCE

**United States Army / Louisiana National Guard – Officer**
**Infantry Company Commander**
- Leadership responsibility for 120 soldiers and over $30 Million in equipment.
- Operation Desert Storm – 1990-1991.

**Staff Officer**
- Responsible for coordination of training and logistical support for a 950-man unit.

## EDUCATION AND PROFESSIONAL DEVELOPMENT

- Louisiana State University: **Commercial Banking**
- **AIB Instructor:** Analyzing Financial Statements; Business Financial Analysis
- **RMA Instructor:** RMA Omega Financial Statement Analysis
- Frequent speaking and roundtable engagements at CLE and industry conferences on the topic of "Working with your Banker when there are problems"

# Appendix C

**Richard B. Gaudet**
**Testimony Experience**



## Independent or Arbitrator Experience

Chatham Investment Fund QP II, LLC and Chatham Investment Fund II, LLC V.
Branch Banking and Trust Company & BB&T
Superior Court of Fulton County, State of Georgia
Case No. 2006-CV-127255

Evidence given at deposition
September 8, 2008

Retained by:    **Branch Banking and Trust Company and BB&T**
Counsel:        William J. Holley, II, Esquire
                Parker, Hudson, Rainer & Dobbs, LLC

## As Fact Witness

Wachovia Bank – Atlanta, GA & Hibernia National Bank – Baton Rouge, LA
Evidence given by affidavit, deposition, at trials and hearings
Approximately 40 occasions
1985 through 2004