# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | Chapter 11 Case |
| VALLAMBROSA HOLDINGS, L.L.C. | ) | |
| | ) | Number <u>08-40791</u> |
| *Debtor* | ) | |
| | ) | |
| | ) | |
| | ) | **FILED** |
| CANPARTNERS REALTY HOLDING | ) | **Samuel L. Kay, Clerk** |
| COMPANY IV, L.L.C. | ) | **United States Bankruptcy Court** |
| | ) | **Savannah, Georgia** |
| *Movant* | ) | **By lbarnard at 12:49 pm, Mar 27, 2009** |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VALLAMBROSA HOLDINGS, L.L.C. | ) | |
| | ) | |
| *Respondent* | ) | |

## <u>INTERIM ORDER ON MOTION TO DISMISS</u>

### <u>I. Introduction</u>

Debtor's case was filed May 6, 2008, on the morning of a scheduled foreclosure over a large tract of land it was developing known as the Vallambrosa Plantation ("Vallambrosa") in Chatham County, Georgia.   Movant Canpartners Realty Holding Company IV, L.L.C. ("Canpartners") had advanced a loan in 2006 in the amount of approximately $28 million secured by the Vallambrosa real estate.  The loan matured in March 2008 by terms of the Note.  Canpartners had also declared default pursuant to other terms of the loan agreement ("Agreement") and accelerated the repayment obligation in the

note.  Movant's Exhibit 31; Respondent's Exhibit 177 (April 1, 2008).  Since the filing of this case, interest continues to accrue on the debt.  Principal and accrued interest as of the commencement of this trial totaled $33,076,831.91 and accrues at a rate of $16,315.00 per day, $489,450.00 per month, or over $5.8 million per year.  Debtor has no cash flow, has unsecured claims of less than one percent of the amount of Canpartners' claim, and has filed, but has not yet confirmed, a Plan of Reorganization.  Jewett W. Tucker, Jr., who filed a personal Chapter 11 case on June 5, 2008, is the sole owner of Debtor.

Vallambrosa "consists of several, contiguous and non-contiguous tracts of land which contain a total combined land area of ± 8,211.534 acres and associated easement rights which are located along or near the Ogeechee River in Chatham County, Georgia."  Movant's Exhibit 56, pg. 1.  "According to the non-recorded Retracement Survey [Id. at pg.2], the subject property includes ± 1,203.102 acres of 'High Ground,' which is comprised of several contiguous tracts containing a combined total land area of ± 1,201.764 acres in the northern portion of the property.  Id. at pg.3.  "The remaining ± 7,008.432 acres of the subject property is comprised of extensive fresh-water and tidal salt-marsh areas which extend southwest and south from the 'High Ground' areas to the Ogeechee River."  Id; see also Respondent's Exhibit 36, pg.17.

Vallambrosa is located in a problematic physical location.  It is bordered on the western edge by a CSX Railroad right of way which must be traversed in order to reach a tract of vacant land on the western side of the railroad.  This western tract is the only way

for Vallambrosa to obtain access directly to U. S. Highway 17.  However, Vallambrosa has limited access for ingress and egress on Chevis Road and Grove Point Road which touch the northern and northeastern extremities of the tract.  It is currently zoned in a way which would theoretically permit over 4,000 residences to be built, but Tucker envisions development of a less-dense Planned Unit Development ("PUD").  Anticipating access across the CSX Railroad, he developed a master conceptual plan calling for 3334 residences.  However, because of the cost of obtaining such access, and based on a preliminary traffic report, he believed he could first build up to 700 homes without the U.S. Highway 17 access.  Indeed, Debtor's original traffic study dated May  2006 had projected that up to 1,200 units could be developed on the tract prior to any connection to U. S. Highway 17 based on existing zoning and typical traffic flow requirements for roads of the type in question.  Respondent's Exhibit 94.

Canpartners seeks dismissal of this case for bad faith under 11 U.S.C. § 1112, alleging, among other things: (1) Tucker made certain misrepresentations to Canpartners that preceded the origination and closing of the loan; (2) Debtor materially failed to meet certain development deadlines required by the Agreement which constitutes an event of default; (3) Tucker concealed at least indirect ownership in a neighboring parcel of land which violates the Agreement; (4) Debtor's case is a single asset case filed on the date of a scheduled foreclosure essentially involving a two-party dispute over Canpartners' efforts to collect its outstanding loan balance; and  (5) dismissal of the case will not cause any job losses, will not have any adverse affect on the economy, and would only result in a change

of the ownership of the underlying real estate. *See* <u>Canpartners' Trial Memorandum</u>, Dckt. No. 176, pgs. 4-6 (Jan. 26, 2009).

Debtor contends that under applicable law, the critical elements for reaching a finding of bad faith do not exist in that there was no eve of foreclosure transfer of the real estate to a new entity nor was there any history of serial filings by Vallambrosa. Instead, Debtor argues it has always pursued this project in good faith and was attempting to settle with Canpartners up to the day of foreclosure. Only when those negotiations fell through did Debtor file its case. Debtor concedes that it may have no employees but argues that it has done over $2 million in work pursuing of the development of this tract through the use of subcontractors.

Debtor also argues that any default was waived because after the first notice of default on February 5, 2007, representatives of Canpartners met with Tucker to address the concerns. After that meeting, no further notice of default was sent, and Canpartners continued to fund draw requests contemplated by the development plan budget. Debtor argues that: (1) it continued to move forward actively to have the site annexed into the City of Savannah which was a prerequisite to obtaining PUD approval after the default letter was sent, and after the maturity date expired on the loan; (2) Canpartners interfered with the progress of the PUD process which resulted in a triggering of default when Debtor failed to meet the deadline for obtaining PUD approval of the development; (3) Canpartners reduced the originally contemplated development cost by $2.4 million rendering Debtor less able to

timely prosecute pre-development work; (4) unforeseen changes in traffic studies and in the position of the MPC staff adversely affected the ability to develop the property without obtaining an unanticipated access point for ingress and egress to the site; and (5) Canpartners, which had a right of first refusal to consider any proposals for permanent financing, would not waive that right thus depriving Debtor of a meaningful ability to find other lenders, all of whom were unwilling to undertake the due diligence necessary to fund a $60 million permanent financing loan while there was still a prospect that Canpartners could step in and assert its right to do the deal.

Canpartners also seeks dismissal of this case under § 1112 because (1) there is no reasonable likelihood that a plan can be confirmed, and (2) there is loss to the estate and an absence of a reasonable likelihood of rehabilitation. *See* <u>Supplemental Motion to Dismiss</u>, Dckt. No. 153 (Jan. 8, 2009). Canpartners has also filed a motion for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (d)(3) asserting both lack of adequate protection and that Debtor cannot confirm a plan within a reasonable time. *See* <u>Motion for Relief</u>, Dckt. No. 95 (Sept. 29, 2009). The plan offers three possible alternatives, the first of which is not in prospect. *See* Stipulated Exhibit K, pgs. 28-29 (August 4, 2008). The second alternative involves receiving a $5 million priming loan to develop sixty marsh front lots and provide the infrastructure for the entire "500 acre core" of the project and then sell remaining tracts or parcels of land to other land developers for an amount sufficient to pay off the Canpartners claim within twenty-four months of the confirmation date. <u>Id</u>. at pgs. 31-41. The third alternative would involve Debtor's transfer of portions of the Vallambrosa

tract, but less than the entirety of the tract, to Canpartners in return for credit amounts established by the Court that would extinguish the Canpartners claim, a plan which is sometimes referred to as an "eat dirt" or "dirt for debt" reorganization cramdown plan. Id. at pgs. 41-42. The Motion for Relief has not been tried, but much of the evidence will overlap evidence on this Motion which was taken over several days.

## II.  Summary of the Testimony

Jonathan Roth, a principal of Canyon Capital Realty Advisors, LLC ("Canyon") of which Movant Canpartners is a wholly owned subsidiary, testified from his knowledge of the origination of the loan.  His company specializes in senior bridge loans of $10 million or greater.  Occasionally, it takes mezzanine or secondary financing positions on projects.  During his tenure, the company has managed over two hundred loans totaling $2.6 billion.  Roth has been involved in approximately two-hundred financing transactions of which almost fifty percent have failed.  The nature of high-risk lending to developers of raw land makes that failure rate predictable.  However, of that fifty percent or nearly one-hundred transactions, Canpartners has only ultimately foreclosed and taken title to real estate on three transactions.

Canpartners was introduced to Tucker with the anticipation that it would make a short term bridge development loan and at the end of that term, would consider longer term permanent financing to see the project through to conclusion.  Canpartners ultimately decided to lend based on (1) the value of the real estate; (2) the business plan

presented by Debtor; and (3) the exit strategy in the event of a default. Canpartners' Internal Loan Investment Summary shows that a co-investor, Brickman Associates, LLC ("Brickman"), would agree to mezzanine or second position financing in the amount of $10 million with the intent of owning the property in event of foreclosure. Respondent's Exhibit 156, pg. 3 (Oct. 4, 2006). Debtor contends this statement shows that Brickman and Canpartners were involved in a predatory "loan to own" transaction. Roth contends that this was simply a risk mitigation factor considered by Canpartners because it wanted to be assured that there would be a party willing and able to take over the loan and pay Canpartners off in the event of default, and Brickman came to the table with that mind set if the development was unsuccessful.

After some preliminary meetings and an inspection of the property, Canpartners issued and the parties executed a term sheet on July 17, 2006, which outlined an agreement in principle to undertake due diligence aimed at extending a $35 million loan over the property of which $8 million would be paid to Mr. Tucker in exchange for his presumed equity in the property.[1] The term sheet required that Canpartners had exclusivity during the due diligence period to work with Tucker in order to finalize the loan agreement. The transaction was coupled with a three percent breakup fee or approximately $1 million that would be charged to Debtor/Tucker if Tucker took negotiations to another potential lender. Movant's Exhibit 9, Exhibit A, pgs. 2-3, 5-6; Respondent's Exhibit 38, Exhibit A.

---

[1] Jonathan Roth signed the term sheet as principal of Canyon. Tucker signed the term sheet in his individual capacity.

The commitment letter, issued following the due diligence period on September 11, 2006, altered the provisions of the term sheet in certain significant ways. [2] Most notably, the commitment reduced the loan amount to $28 million from which Mr. Tucker would realize equity of less than $500,000.00. *See* Movant's Exhibit 9, pg. 1. Mr. Roth explained that during its due diligence period, Canpartners believed that Mr. Tucker failed to adequately disclose the extent of his other business interests and real estate holdings. During the due diligence process, Canpartners discovered that Tucker did in fact own or have options on other properties, and Canpartners required those to be included in its collateral package, and the amounts necessary to exercise the options were paid at closing. Ultimately, the Agreement was executed (Stipulated Exhibit B), together with a promissory note (Exhibit C), a deed to secure debt (Exhibit D), an assignment of rents, etc. (Exhibit E), and an assignment of permits and entitlements (Exhibit F).

The Agreement contains a covenant that (1) Debtor and Tucker could not directly or indirectly own any other property within a two hundred and fifty mile radius of the property. Stipulated Exhibit B, ¶7.14, pgs. 48-49; and (2) Debtor and Tucker were pledging all the property they owned directly or indirectly in Chatham County, including "option rights," to secure the promissory note. Id., ¶4.7, pgs. 21-22. The loan had a maturity date of March 29, 2008, with a possibility of an extension of six months if certain preconditions were met. Stipulated Exhibit C, ¶1.29, pg. 28; ¶ 2.43, pgs. 5-6. The Agreement also contains a full integration clause merging all pre-agreement negotiations into

---

[2] Jonathan Roth signed commitment letter as principal of Canpartners and Kathy Corton signed as principal of Brickman. Tucker signed the letter in his individual capacity.

the terms of the document itself. Stipulated Exhibit B, ¶ 11.14, pg. 71.

The Agreement contemplated the possibility of a future "new loan" by Canpartners of approximately $60 million which the parties would entertain advancing after Debtor received the necessary entitlements to develop the property including, but not limited to, the planned PUD approval from the MPC and local governing authorities, and so long as no default existed. That loan was never requested, and the entitlements were never obtained during the term of the loan. The Agreement also provided Canpartners right of first refusal in the event Debtor sought new financing by a third party. *See* Stipulated Exhibit B, ¶ 6.27, pg. 45.

When the $28 million transaction was closed, funds were disbursed as illustrated on Stipulated Exhibit H to pay off existing indebtedness owed by Mr. Tucker or Debtor[3] and to exercise options[4] on the various parcels that comprised Vallambrosa, to pre-pay the interest, tax and predevelopment cost, and to pay equity to Mr. Tucker of approximately $38,000.00.

Schedule 5.2 of the Agreement establishes a project schedule for the development. *See* Stipulated Exhibit B, ¶5.2, pg. 28. By the end of 2006, among many other deadlines, Debtor was required to prepare the Master Plan for the PUD and receive approval

---

[3] A balance was due to Guardian Bank, First State Bank and Trust Company of Valdosta, Bryan Bank and Trust, James R. Gardner Trust Account, and Branch Banking and Trust Company.

[4] Options prices were paid to Wiregrass Holdings, LLC, Barclay Rushton/Dennis and Mary Smith, and Glawson's Investment Corporation.

from Canpartners.  By the end of February 2007, Debtor was required to finalize the Master Plan and complete Homeowner's Association Agreement (HOA) documents.  By the end of March 2007, Debtor was required to submit the PUD and receive zoning approval.  The PUD was not submitted until late May 2008.  Debtor was also required to submit a wetlands permit to United States Army Corps of Engineers for approval.  By May 31, 2007, Debtor was required to have finished the design of Phase 1 - the first 60 lots of a total of 240 lots and to begin lot construction by July 31, 2007.  All 240 lots were to have been constructed by September 2008.

By the end of 2006, Debtor had fallen behind schedule and never met the Agreement deadlines thereafter.  From the time of the loan closing in September 2006 through March 2007, Jamie Forbes, the project manager, actively tried to meet the deadlines and routinely updated the representatives of Canpartners on his progress.  However, after the project fell behind schedule at the end of 2006, Canpartners sent a letter to Vallambrosa on February 5, 2007, outlining a series of defaults.  Movant's Exhibit 26.  After much correspondence between Forbes and Canpartners, Vallambrosa sent a letter to Canpartners on April 10, 2007, stating all those defaults had been cured.  Respondent's Exhibit 174.  After questioning the sufficiency of the alleged cures in an April 13, 2007, letter, representatives of Canpartners met with representatives of Vallambrosa on April 19, 2007, to resolve all issues.  *See* Movant's Exhibit 27; Respondent's Exhibit 103.

In June 2007, Forbes was fired, and Rob Lee was hired on a full-time basis.

Between August 2007 and November 2007, several draw requests by Lee were approved by Canpartners. *See* Respondent's Exhibits 12, 13, 14 and 16. On November 12, 2007, Lee submitted a draft of the PUD to Canpartners for its approval hoping to submit the PUD for zoning approval by December 15, 2007. Respondent's Exhibit 110. Even a submission on this date would have been approximately eight months late, and in fact the PUD was not submitted until May 2008.

A six month extension was permitted by the loan documents if four conditions were met: (1) a request in writing for an extension sixty days prior to the maturity; (2) the existence of no event of default as defined under the terms of the agreement; (3) the payment of one percent of the outstanding principal balance at the time the extension option is exercised; and (4) the replenishment of reserve accounts that had been drawn down for interest, taxes and development costs. Stipulated Exhibit C, ¶ 2.43, pgs. 5-6. On January 18, 2008, in advance of the sixty day deadline for requesting an extension, Michael Downes, the representative of Canpartners who dealt directly with Debtor after the loan closing, wrote a letter to Tucker reminding him of his right to extend and the deadline for taking such action. Movant's Exhibit 28. Tucker took no action in response to that letter. Also, both before and after the default, Downes had discussions with Tucker about the possibility of extending the loan. Downes always informed Tucker that to extend the loan, he would have to comply with the provisions of the agreement. However, Tucker never sent any notice or tendered any funds to gain the benefit of an extension, and the loan matured March 29, 2008.

On March 18, 2008, counsel for Canpartners addressed a letter to Debtor and Tucker declaring default and giving notice that Debtor had failed to timely extend the maturity date of the note.  It further advised that Canpartners would not extend the maturity and demanded payment in full not later than the maturity date. Movant's Exhibit 30; Stipulated Exhibit M.   Debtor did not pay the balance as demanded, and on April 1, 2008, Canpartners issued a demand letter stating its intention to commence a non-judicial foreclosure. Respondent's Exhibit 177; Movant's Exhibit 31.  On April 7, 2008, Canpartners swept the balances in the various reserve accounts, approximately $935,000, in accordance with the terms of the Agreement. Movant's Exhibit 32.

After maturity, there were continuing discussions between Canpartners, Mr. Tucker, and their counsel, concerning a forbearance agreement. After demand for payment was sent by Canpartners' counsel (Respondent's Exhibits 11 and 119; Movant Exhibit's 30; Stipulated Exhibit M), a foreclosure notice was run in the *Savannah Morning News* as required by Georgia law for the conduct of a nonjudicial foreclosure on the first Tuesday in May.   Stipulated Exhibit I.  Documents were exchanged back and forth, but terms were never agreed to, even after the parties agreed to defer the scheduled foreclosure sale from 11:00 a.m., to 2:00 p.m., on the first Tuesday in May 2008.  When those discussions fell apart, Debtor filed this Chapter 11.

After the bankruptcy filing, Debtor and Rob Lee continued to seek the zoning changes necessary to move the project forward. *See* Respondents' Exhibit 25.  The

PUD was submitted in May 2008. On June 11, 2008, a letter was written to the Metropolitan Planning Commission ("MPC") by Canpartners which recites that it was written at Vallambrosa's request and advises the MPC that as lender, it supported the approval of the PUD. Movants' Exhibit 33. On July 15, 2008, the MPC staff issued its memorandum concerning the PUD. Movants' Exhibit 75. That staff report recommended approval of the PUD, which contemplated 3334 residential units, subject to the limitation that access to Grove Point and Chevis Roads be for "emergency exits" only.  The report recognized, however, that the County Engineer could still "theoretically" approve ingress and egress to those roads, and recommended that mandatory development check points concerning traffic be included in the PUD ordinance to guide any such decision. That schedule recommended that construction of the U.S. Highway 17 connector must begin at 21.7% of development or 723 residences. Id. at pg. 5. Following private and public meetings and in the face of neighborhood opposition to the plan, on October 3, 2008, Canpartners sent a letter to Lee requesting a delay of the MPC vote so they might review the MPC recommendations. Movant's Exhibit 34; Respondent's Exhibit 144.

On October 7, 2008, the MPC issued another report, this time subjecting recommended approval of the PUD to the qualification that "no certificates of occupancy" could be issued on any residence until access to U. S. Highway 17 had been provided. Stipulated Exhibit O, pg 6. It retained the "emergency exit" only designation for Grove Point Road and Chevis Road and stated that restriction could only be lifted with concurrence of the traffic engineer and an amendment to the PUD ordinance. Id. at pg.10. A subsequent MPC

staff report in November 2008 also restricted issuance of certificates of occupancy until after access to U. S. Highway 17 was achieved directly across the CSX Railroad property. Stipulated Exhibit P. After the November MPC report, Canpartners asked Lee to suspend any activity regarding the PUD until after this matter was resolved.

It was at that time that Roth testified he learned for the first time that the only tract of land on the west side of the railroad with frontage on U. S. Highway 17 was owned by Lee and his father and that it was subject to an unrecorded option to purchase held by Kings Ferry Plantations, LLC, a company owned by Tucker, at the time of the loan closing. *See* Movant's Exhibit 50. Canpartners claims that this unrecorded option interest violated the Agreement. Roth testified that Canpartners would not have made the loan if it had known that Tucker, in violation of their covenants with them, held or controlled that option.

## CONCLUSIONS OF LAW

An issue that must be decided which is fundamental to the future course of this case, whether for the purpose of this dismissal motion or subsequent pleadings, is the value of this tract of land. For example, valuation is necessary as a starting point in determining *inter alia*:

1)      Whether there is a reasonable likelihood that a plan can be confirmed under §
        1112(b)(2)(A).

2)   Whether there is cause for dismissal or conversion including loss to the estate and the absence of a reasonable likelihood of rehabilitation.  § 1112(b)(4)(A).

3)   Whether Debtor has a plan which has a reasonable possibility of being confirmed.  11 U.S.C. § 362(d)(3)(A).

4)   Whether there is equity in the property or whether cause exists to grant stay relief.  11 U.S.C. § 362(d)(1) and (2).

The date of the valuation will differ depending on which section is being applied, but one relevant date, and the date for which testimony was taken at this trial, is the filing date of May 6, 2008.

Valuation of any piece of property is always a difficult process.  It becomes even more difficult as one moves from rather homogenous types of property as, for example, motor vehicles, to single family residences in well-established neighborhoods, to vacant lots, to tracts of undeveloped real estate.  It is even more difficult a task when the underlying economic conditions make less certain whether one can really identify a hypothetical willing buyer and seller, neither acting under any duress.  This case reflects a microcosm of the unprecedented economic times in which this country finds itself in that the value of this property which the parties anticipated in 2006 is very different in 2008.

The Court has heard several hours of testimony by two eminently qualified appraisers, Joel Crisler and Joel Pakula. Both have extensive education, training, and

professional qualifications and were mutually stipulated as experts. Crisler, using a Sales Comparison Approach and analyzing similar large waterfront land tracts in Coastal Georgia, has concluded that the property "as is" is worth $29,275,000.00. Movant's Exhibit 56, pgs. 37, 39. Pakula, using a Subdivision Sellout Analysis approach, a variation of the Income Capitalization Approach, has concluded the property is worth $52.5 million. Respondent's Exhibit 36, pg. 2. Each appraiser believes that he has selected the approach which is the most reliable, or at least more empirical, than the other witness's methodology.

This Court has presided over scores of valuation hearings involving items of personal property of fairly limited value, real estate of all sizes from individual lots to single family homes, and larger residential, commercial, and industrial tracts of land. It goes without saying that the further one moves on that continuum towards larger, less fungible, and more expensive real estate, the more subjective the process becomes. Even in single family residential appraisals, an appraiser must take homes that sold within a relevant time frame in the same or a similar neighborhood and make certain adjustments based on the property's physical condition, number of square feet, number and arrangement of rooms, and either physical or practical obsolescence. Applying upward and downward adjustments in each of those categories always involves some subjective rather than purely objective analysis.

In many contested valuation hearings, this Court hears from witnesses, each of whom bring to the analysis some elements which this Court finds more persuasive than

others, and in many cases, a valuation decision will involve this Court accepting one witness's adjustments in one area and the other witness's adjustments in another.  Indeed, the Court is not required to accept any expert's opinion as the final word.  *See* Helvering v. Natl. Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346 (1938) (This Court is not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment).  In this case, the fundamental difference in the two appraisals was whether to use a method comparing similar large tract land sales intended for subsequent development or whether to calculate value based on the discounted cash flow of a long term sell-out of an as-yet unapproved subdivision development with certain amenities.

After careful deliberation and consideration, I have concluded that as of May 6, 2008, in light of the then apparent downturn in the economy and in the real estate and credit markets, the Sales Comparison Approach is the more reliable method. This downturn was noted in both appraisers' testimony, as well as the testimony of a financial expert, Richard Gaudet, who characterized the market beginning in 2007 as very distressed.  There certainly was a time in the early part of this decade when the methodology applied by Mr. Pakula had considerable merit.[5]  Any developer or lender to a developer in a rising real estate market, with generally reasonable interest rates and a strong economy, would be interested not so much in owning a large tract of undivided real estate for an unknown period of time and an unknown ultimate purpose, but would want to see a good faith, intelligent, and

---

[5] Debtor is correct in its assertion that Movant's proffered cases In re Melgar Enterprises, 151 B.R. 34 (Bankr. E.D.N.Y. 1993) and In re Tamarack Trail Co., 23 B.R. 3 (Bankr. S.D. Ohio 1982) do not create a *per se* rule rejecting the Subdivision Sellout Analysis.  Debtor's Rebuttal Brief, Dckt. No. 224 (March 10, 2009).

realistic projection of how one might take the tract of land, develop it and sell it, pay off the debt, and earn a profit. Mr. Pakula's selection of that approach was therefore an appropriate one at an earlier time and will hopefully become so again. However, in light of the malaise affecting the economy and real estate market by early 2008, I find the Land Sales comparison approach represents the more reliable method of determining value.

Even if my conclusion, that solely based on relevant economic conditions the Land Sales Comparison is the preferable approach, is wrong, I find that because the Subdivision Sellout Analysis requires far more numerous and complex assumptions and projections than the Land Sales Approach, it has a greater potential for error. It requires the appraiser to do the following:

### Subdivision Sell-Out Analysis

1) Select comparable developments;
2) Analyze average prices for each type of lot;
3) Make a qualitative comparison of the lots proposed in the subject property with the comparable development lots;
4) Project an average price per lot in the finished development;
5) Project the time necessary to complete regulatory entitlements;
6) Project the cost of site development;
7) Project the average number of lots which will sell annually;
8) Project the price progression of average lot prices annually for the life of the project;
9) Take annual expenses less costs and reduce that amount to the present value for each year of the sell-out period;
10) Perform similar projections for the income stream of

golf or club memberships in the development.

In contrast the number of subjective decisions or adjustments of the Sales Comparison Analysis are more limited:

### Sales Comparison Analysis

1) Select comparable large pre-development tracts;
2) Select criteria which enhance or reduce the value of each tract;
3) Make a qualitative comparison of the comparables to the subject;
4) Adjust the value of each comparable, or the closest comparable, to find an indicated value of the subject tract.

If either appraiser misses the mark on any one of his underlying assumptions or adjustments, of course, it will affect the bottom line conclusion, but the multiplicity of adjustments required in the Pakula analysis makes it inherently less reliable, standing alone, than the Crisler analysis.

Moreover, even if I were persuaded that the Subdivision Sellout Analysis method could be employed in this case, I could not accept Pakula's final value opinion of $52,500,000.00 for the following reasons.

I accept his selection of comparable developments for lot sales price comparisons.   However, the fundamental requirement for beginning this analysis is

determining the projected average sales price per lot, by category, for the development.  In order to do this, Pakula examined List Prices, not actual sales prices, in his comparable developments.  He then adjusted these List Prices to arrive at an average projected sales price for golf, marsh, green way, and interior lots at Vallambrosa.  His data intensive analysis begins at page 95, and established certain lot prices, for example, of golf lots as they relate to lot size.  *See* Respondent's Exhibit 36, pgs. 96-101.

However, in making this projection, Pakula lacked a central piece of information.  He did not have a plat of the development which showed how and where the golf lots would be oriented along the projected golf course which likewise was also not platted.  Thus, in reaching any conclusions about price, his analysis deviated from USAP Standards Rule 1-2(e). Movant's Exhibit 79.  Indeed, a Treatise on this subject states that data necessary for this approach will "usually" include a "subdivision plat."  Debtor's Rebuttal Brief, Dckt. No. 224, Exhibit A, pg. 343.  That source contemplates that a "preliminary development plan" will specify much of the data the appraiser needs including the "number and size of lots."  Lacking this specific information, the Pakula appraisal originated on shaky ground. Even his report recognized that possibility.  *See* Respondent's Exhibit 36, pg. 12.

Second, in projecting future lot sales prices based on current listings rather than actual sales, Pakula adopted a less reliable indicator of value.  He explained that due to the multiple types of lots in the various comparable developments, there were insufficient

sales to use actual sales numbers.  However, even using List Prices as his starting point, he did not do any sales ratio analyses to find the typical discount taken off the list price which comparable lots sold for.  As a result the List Prices resulted in an inflated projected sales price of $326,144.00 per lot.  Id. pg. 161.

Third, he made an upward twenty-five percent adjustment to $408,908.00 per lot utilizing only two comparables, Southbridge and Savannah Quarters.  He attributed the higher values per lot at Savannah Quarters to lower density as well as the comparative age of the projects.  He did not take into account the fact that (1) Savannah Quarters is gated and Southbridge is not; (2) Golf at Savannah Quarters is exclusively private and Southbridge is open to the public; and (3) Amenities at Savannah Quarters included a substantially larger and newer clubhouse facility.  I find the twenty-five percent density adjustment to be unsupported by the evidence.

Fourth, Pakula projected an absorption rate of just over four lots per month or fifty lots per year over the life of the project.  Id. at pg. 120.  In arriving at this number, he projected demand for 4,000 housing units per year based on past history and anticipated future population growth.  However, average permits issued over a twenty year span in the Savannah MSA have been 2,556 annually and for the most recent twelve years, 2,897 annually.  Id. at pg. 120.  In only two years since 1985 were more than 4,000 permits issued, the most recent of which was at the peak of the housing boom.  Id. at pg. 46.  In assuming that level will exist in the future, Pakula lacked supporting data and disregarded his own

[reused]

statements about the current state of the economy. Id. at pg. 20.

Fifth, he performed his analysis on the assumption that 800 lots could be developed with no access to U. S. Highway 17. Id. at pg. 176. This projection flies in the face of the MPC staff recommendation he reviewed which indicated that construction of a U. S. Highway 17 connector must begin when 723 residential units are in place. His conclusion that 800 units could be built without that connector is wrong. A maximum of 723 lots could be built, but even that number contemplates eventual U.S. Highway 17 access. It was only the construction of that road that could be deferred while 723 units were built. Id. at pg. 12.

Finally, the Treatise provided to the Court recognizes that the Subdivision approach, when used on its own, "can be the least accurate raw land valuation technique." Debtor's Rebuttal Brief, Dckt. No. 224, Exhibit A, pg. 341. It is "most persuasive" when the sales comparison "provides additional support." Id. at pg. 343. Pakula, therefore, correctly tested his conclusion against comparable sales of tracts of raw land. He concluded, as did Crisler, that a tract in Camden County, which was variously described as Dover Bluff Road at Episcopal Church Road, or Bridge Point at Jekyll Island Sound, and numbered Comparable 5, by both of them was the "most comparable." It sold for an adjusted price per developable acre of $31,311.00. That price clearly does not provide "additional support" for the subdivision analysis value. Pakula's report, however, adjusts that actual sales figure to a theoretical $57,000.00 per acre. Respondent's Exhibit 36, pg. 159. In making that

adjustment, Pakula used his own projected sales price of $408,000.00 per lot in order to back into a much higher per acre value than was actually paid. By importing elements of his Subdivision Sales projections to adjust the actual, "most comparable" land tract sale upward by a factor of over eighty percent, he completely negated any "supportive" role that sale might have provided for his conclusion. As the Treatise states:

> Without an abundance of reliable market data [the Subdivision Approach] can be the least accurate raw land valuation technique.
>
> Debtor's Rebuttal Brief, Dckt. No. 224, Exhibit A, pg. 342.

From its shaky start, Pakula progressively rested on an increasingly weak foundation. For all the reasons outlined in this discussion, I reject his conclusion as to value.

Turning then to Crisler's appraisal and supporting testimony, Crisler concluded that the highest and best use of the Vallambrosa property would be for "holding in anticipation of some type of future planned residential development." Movant's Exhibit 56, pg. 36. Based on "current market conditions," he opined that an investor would project an 18-36 month period prior to there being "adequate demand" to commence this type of development. Id. His conclusions concerning market conditions were based on data showing that sales, which were strong through 2006, began to "slow significantly" by early 2007. Id. at pg. 30. Indeed the graph of lot sales and building permits showed a precipitous decline

from 2006 to 2007 to early 2008.[6] Id. at pg. 31. He concluded that there was an oversupply of lots and finished homes and that supply and demand equilibrium might not occur for 18-36 months or longer. Id. at pg. 34.

To perform an "as is" appraisal, Crisler accepted the developer's belief that, although the tract has 835 acres of developable upland, there is an additional 140 acres of "impacted wetlands" which are potentially developable, and calculated his value on 975 rather than 835 acres. He also accepted that vehicular access to the site for up to 700 residences could be gained from Grove Point Road and Chevis Road.

With this background, he analyzed "seven recent sales of other large waterfront land tracts in coastal Georgia having similar characteristics . . ." intended for "residential or mixed use development." Id. at pg. 36. These sales ranged in price per developable acre from $20,439.00 to $59,512.00. Each was compared to the subject "on the basis of its proximity to its marsh/amenity views, deep-water accessibility, public road access, proposed residential development density, potential for development with some non-residential uses, and the likely time of commencement of its development as proposed." Id. at pg. 39.

After balancing these factors, Crisler rated his comparables to the

---

[6] In many respects Pakula did not see the market differently. See Respondent's Exhibit 36, pgs. 20; 37-43; 46-47.

Vallambrosa tract and found some to be superior and others inferior. *See* Id., Chart preceding pg. 39. Placing most reliance on Sale Number 5, he concluded a value "as is" of $30,000.00 per developable acre, or $29,275,890.00, rounded to $29,275.000.00.[7]

After a full consideration of his testimony, his report, and the rebuttal evidence offered by Debtor, I conclude that Land Sale Number 5 is, in fact, the most comparable of the seven. Indeed, to the extent that Pakula employed the Land Sales Approach, he also concluded that this tract is the best comparable.

Utilizing Sale Number 5 as his primary focus, Crisler reduced the per acre value from $31,311.00 to $30,000.00. His rationale for this, other than his acknowledged expertise, was not explained, so I will give greater weight to $31,311.00 per acre or $30,555,000.00 for the tract (Value A). As stated earlier in this Order, however, I am not required to accept the opinion of any expert as final. Applying my independent analysis to his findings, I conclude that of the seven comparables, two others, Number 1 and Number 7, bear special significance. Comparables Number 1, 5 and 7 are the only tracts that share common amenity packages. Each of them has good to excellent deepwater access, contemplates a golf course development, and Numbers 1 and 7 have some degree of access to water and sewer infrastructure as does the subject property. Although all these comparables have inferior location to that of the subject in relation to an international airport or major urban center, Number 1 has significant commercial development value and Number

---

[7] In the discussion to follow, I will also use rounded numbers.

7 has superior deepwater and ocean access, both of which the subject lacks. Averaging these three comparables results in an indicated value of $33,105.00 per acre or $32,306,000.00 (Value B).

I note that simply averaging all seven comparables yields an indicated value of $35,116.00 per acre or $34,269,000.00 (Value C). However, using all seven comparables gives insufficient deference to the rating system employed by Crisler to suggest which tracts break out of the pack and deserve greater weight. On the other hand, focusing solely on comparable 5 may result in too narrow a sample to be reliable. Averaging Values A, B, and C indicates a blended average value of $32,376,000.00, remarkably close to the average of what I consider the best three comparables (1, 5 and 7), $32,306,000.00. When larger samples coalesce around a certain value, I conclude that number to be correct. I therefore hold that the value of Vallambrosa Plantation, subject to one final adjustment, is $32,350,000.00.

That remaining value adjustment which I must address is the existing water and sewer infrastructure on the Vallambrosa tract. Crisler noted "similar" infrastructure only on sales Number 1 and Number 7, but understandably was not able to make a direct comparison of the cost of their infrastructure and the cost of the Vallambrosa infrastructure. All the other comparables had no water and sewer infrastructure. Because the record reveals that Debtor has invested $3 million to bring water and sewer access to the site and to

construct a lift station, I conclude that sum should be added to the indicated value of Vallambrosa to insure that the full measure of these improvements is accounted for.

I therefore find the value of the Vallambrosa tract as of May 6, 2008, was $35,350,000.00.

Debtor's contention that Sale Number 5 should be adjusted by adding the higher infrastructure cost estimate of $5.2 million or $8,950.00 per acre which would indicate a value of $40,261.00 per acre or approximately $39,289,000.00 is incorrect. The record is insufficient to establish whether this estimated cost, if added to the purchase price of Sale Number 5, would result in infrastructure which equals or exceeds the level of water and sewer presently on site at the Vallambrosa tract. Because Sale Number 5 has no water and sewer in place and Vallambrosa has a $3 million investment in that infrastructure, the correct adjustment would be limited to that amount. Using that method of adjustment indicates a value for Vallambrosa of $35,587,000.00 - a figure which clearly supports my conclusion.

Finally, I note that all calculations credit the Vallambrosa tract with 975.863 developable acres, not 835.293, the actual number of upland acres, excluding jurisdictional wetlands identified by the United States Army Corps of Engineers. *See* Id., Plat following pg. 18. Crisler's allowance of this acreage results in $4.2 million more value to the tract than

it would have if the additional acreage cannot be developed.  That additional value was included based on Lee's good faith belief that those additional acres could ultimately be developed, but his opinion is contingent upon future development of an as yet unapproved golf course and the acceptance by regulatory agencies of development of those 140 acres of delineated wetlands.  In making that allowance, Crisler and the Court are clearly giving Debtor the benefit of the doubt.

### O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the value of the Vallambrosa tract, as of May 6, 2008, is established at $35,350,000.00.  The parties are granted additional time to file briefs,  on all remaining issues relating to the Motion to Dismiss and Supplemental Motion to Dismiss utilizing only that Valuation conclusion and complying with the following deadlines:

|  |  |
|---|---|
| Movant's Brief due | April 10, 2009 |
| Debtor's Reply due | April 17, 2009 |

Oral arguments and a Settlement Conference will be conducted on Monday, April 20, 2009, at 12:00 o'clock noon.

Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This ___ day of March, 2009.