# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

| | | |
|---|---|---|
| In the matter of: | ) | Chapter 11 Case |
| VALLAMBROSA HOLDINGS, L.L.C. | ) | Number <u>08-40791</u> |
| *Debtor* | ) | |
| | ) | **FILED** |
| CANPARTNERS REALTY HOLDING COMPANY IV, L.L.C. | ) | Samuel L. Kay, Clerk<br>United States Bankruptcy Court<br>Savannah, Georgia<br>By lbarnard at 4:41 pm, May 21, 2009 |
| *Movant* | ) | |
| v. | ) | |
| VALLAMBROSA HOLDINGS, L.L.C. | ) | |
| *Respondent* | ) | |

## FINAL ORDER ON MOTION TO DISMISS

All the Findings of Fact and Conclusions of Law contained in my March 27, 2009, Interim Order, Docket Number 244, are hereby incorporated and further supplemented by this Order. In the Interim Order, I held that the value of the Vallambrosa tract as of May 6, 2008, the petition date, was $35,350,000.00. In light of this value, Canpartners Realty Holding Company IV, L.L.C. ("Canpartners") seeks dismissal of this case for "cause" under 11 U.S.C. § 1112 for (1) lack of good faith in filing this Chapter 11; and (2) loss to the estate and an absence of a reasonable likelihood of rehabilitation.

AO 72A
(Rev. 8/82)

**1. Dismissal for Lack of Good Faith**

"[T]he court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate if the movant establishes cause . . . " 11 U.S.C. § 1112(b)(1). "Although § 1112(b)(4) contains a list of factors that may constitute "cause," that list is not exhaustive." In re Global Ship Sys., LLC., 391 B.R. 193, 202 (Bankr.S.D.Ga. 2007)(Davis, J)(*citing* H.R.Rep.No. 95-595, at 406 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6362 ("[The] list [contained in § 1112(d)] is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.")))

"In this Circuit, there is clear and long established guidance which holds that a Chapter 11 case which is not filed in good faith can be dismissed for 'cause.'" In re Global Ship Sys., LLC., 391 B.R. at 202 (*citing* Albany Partners Ltd. v. W.P. Westbrook (In re Albany Partners, Ltd.), 749 F.2d 670, 674 (11th Cir. 1984); Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va., (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394 (11th Cir. 1988)). While there is no particular test for determining whether a debtor has filed a voluntary petition without the requisite good faith, the Eleventh Circuit in Phoenix Piccadilly stated that "the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'." 849 F.2d at 1394 (*quoting* Albany Partners, 749 F.2d at 674).

The Eleventh Circuit identified the following circumstantial factors which evidence a lack of good faith filing:

> 1) Whether the debtor is a so-called single asset debtor.
>
> 2) Whether the debtor has relatively few unsecured claims whose claims are small in relation to those of secured creditors.
>
> 3) Whether the debtor has a limited number of employees.
>
> 4) Whether the asset of the debtor is subject to a pending foreclosure action as a result of arrearages on the indebtedness.
>
> 5) Whether the debtor's financial problems involve largely a dispute between the debtor and secured creditors which can be resolved in a pending State Court action.
>
> 6) Whether the timing of the debtor's filing evidences an attempt to delay or frustrate the legitimate efforts of the secured creditors to enforce their rights under state law.
>
> Id.(citations omitted).

These factors are "appropriate guidelines for consideration when evaluating whether a Chapter 11 petition in a single asset real estate case was filed in bad faith." In re State St. Houses, Inc., 356 F.3d 1345, 1347 (11th Cir. 2004). I find that Debtor fits neatly within the traditional factors defined by 11th Circuit precedent.

First, Debtor has only one asset, the Vallambrosa property.

Second, the claims of the unsecured creditors are greatly exceeded by the secured claims. Based on the claims register, there are $31,297,650.00 in secured claims compared to $2,181919.32 non priority unsecured claims and $172,551.64 in priority unsecured claims.[1] *See* In re State St. Houses, Inc., 305 B.R. 726, 735-36 (Bankr.S.D.Fla. 2002)(found this factor weighs in favor of a finding a lack of good faith because the secured claims were $14,400,000 and the unsecured claims were $3,000,000), *aff'd*, 305 B.R. 738 (S.D.Fla. 2003), *aff'd*, 356 F.3d 1345 (11th Cir. 2004).

Third, Debtor has no employees and is not currently conducting any ongoing business. To the extent that Debtor argues that it works through independent contractors, these contractors are not solely dependent on Debtor for their livelihood. As a result, this factor weighs in favor of a finding of a lack of good faith. *See* Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture), 936 F.2d 814, 817 (5th Cir. 1991).

Fourth, since the ongoing litigation between Debtor and Canpartners relates to this single asset and since Debtor faces no imminent threat from any of its other creditors, there is compelling evidence that this Chapter 11 filing is a mere two-party dispute relating to real property with Canpartners, as the secured lender, trying to foreclose, and Debtor seeking to avoid foreclosure. *See* In re State Street Houses, Inc., 305 B.R. at 736.

---

[1] The largest unsecured creditor, with a claim totaling $1,000,000.00, is Lanyard Development, Inc., a company which is owned by Mr. Rob Lee, for consulting fees that are contingent on Mr. Lee's ability to obtain PUD approval. As shown by the facts, the PUD approval has not happened and is contingent on obtaining access to US Highway 17, access which is only available through property owned by Mr. Lee.

Fifth, Debtor's case was filed on the eve of foreclosure. Even though it is true that Debtor was negotiating a settlement with Canpartners up to the day of foreclosure, Jewitt W. Tucker, Jr., ("Tucker"), owner of the Debtor, admitted that his motive for filing was to stall Canpartners foreclosure in an attempt to extend those negotiations. At the time of the petition, the loan was past its maturity date, Debtor had not performed the prerequisites to obtain an extension on the maturity date, and Debtor had tried but not succeeded in obtaining any financing to pay Canpartners' loan in full. *See* Phoenix Piccadilly, 849 F.2d at 1395 (found this factor weighs in favor of a finding of bad faith because the debtor's agent admitted its purpose of filing the petition was to delay the secured creditors foreclosure action).

Although Debtor had some equity[2] in the property and could have arguably filed its petition to preserve that equity, that is not persuasive in this particular case as explained in the next section of this Order. Furthermore, possible equity in the property or a potential for a successful reorganization does not preclude a finding of a bad faith filing. Phoenix Piccadilly, 849 F.2d at 1395.

Canpartners urges that the presence of the factors outlined in Phoenix Piccadilly should result in a finding of bad faith as a matter of law. However, "[t]his assertion

---

[2] Based on my ruling *supra* and the claims register, there was approximately $4 million in equity as of the date of filing, but it eroded at a rate of approximately $500,000.00 per month due to Canpartners' interest accrual, which had resulted in Debtor, as of the commencement of this trial, having approximately $2 million in equity. Now, as of the date of the last hearing, Debtor has an equity cushion of only approximately $600,000.00.

is incorrect." In other words, "[t]he factors cited by both the Eleventh Circuit and other courts are guidelines for the exercise of the Court's sound discretion. Bad faith in the filing of a bankruptcy petition is a finding of fact not subject to any per se approach." In re Clinton Fields, Inc., 168 B.R. 265, 269-271 (Bankr.M.D.Ga. 1994)(*citing* Home Fed. Sav. v. Club Candlewood Assoc., LP. (In re Club Candlewood Assoc., L.P.), 106 B.R. 752, 756-57 (Bankr.N.D.Ga. 1989)(" . . . it is not the *per se* existence of many of the indicia, standing alone, which necessarily mandate a finding of bad faith. It is the entire context of the circumstances which compel the inference of abuse of the court's jurisdiction.")); *see also* In re McKinnon, 378 B.R. 405, 415 (Bankr.S.D.Ga. 2007)(Dalis, J.); PNC Bank, N.A. v. Park Forest Dev. Corp. (In re Park Forest Dev. Corp.), 197 B.R. 388, 393-94 (Bankr.N.D.Ga. 1996)(Bihary, J.).

I agree that the analysis requires more than a technical check-list approach. For example, in In re Clinton Fields, Inc., 168 B.R. 265 (Bankr.M.D.Ga. 1994)(Walker, J.), the debtor's sole asset was undeveloped real estate in which a creditor had a security interest. The debtor had made several payments to the secured creditor during the term of the loan, and even at one point sold a portion of the property of which the secured creditor received the proceeds. The secured creditor and the debtor then entered into a new financing agreement. The debtor later defaulted, and the secured creditor attempted to foreclose on the property. On the foreclosure date, the debtor filed for Chapter 11. Id. at 266-67.

In its analysis, the court acknowledged that though most of the Phoenix

Piccadilly factors were met,³ there were several exculpatory factors that led the court to conclude the debtor filed its petition in good faith. Id. at 270-71.

None of these exculpatory factors, or anything of a similar nature exists in this case. The secured creditor has not received any cash proceeds from Debtor, no specific plan for development has been approved nor has any development been substantially implemented, and Debtor's future development plan requires extensive additional funding. Furthermore, Debtor needs an additional $5 million to fund its Chapter 11 plan, obtaining those funds is speculative and unrealistic, and Debtor's plan proposes to not pay Canpartners for another two years, a time frame which, as explained later, is unrealistic.

In contrast, the case was not simply filed after default and acceleration of the note and on the eve of a non-judicial foreclosure. Rather, the case was filed after the contractual maturity date of the note, and Debtor, clearly on notice of that deadline, failed to or was unable to refinance the note or exercise his contractual rights to an extension. The maturity date of the loan expired after Debtor repeatedly failed to timely perform contractual duties and meet development deadlines agreed to at the inception of the loan, as discussed in my earlier Order.⁴  These facts tip the scale in evaluating the entire context of the filing

---

³ See Id. at 271 ("many of the factors evidencing bad faith cited by the court in Phoenix Piccadilly are present in this case . . . ").

⁴ As discussed in the Interim Order, the Loan Agreement, signed by Tucker, contains a covenant that (1) Debtor and Tucker could not directly or indirectly own any other property within a two hundred and fifty mile radius of the property. Stipulated Exhibit B, ¶ 7.14, pgs. 48-49; and (2) Debtor and Tucker were pledging all the property owned directly or indirectly in Chatham County, including "option rights," to secure the promissory note. Id., ¶ 4.7, pgs. 21-22. The record shows that almost immediately after the July 17, 2006, Term Sheet and during

of this case. See Interim Order, Dckt. No. 244, pgs. 7-10; 13-14.

In weighing all the factors, the rehabilitative purposes of the Code, and the conduct of Debtor, I find Debtor filed its petition with a lack of good faith. Therefore, Canpartners' Motion to Dismiss is granted.

### 2. Dismissal under § 1112 for "cause"

In the alternative Canpartners seeks dismissal of the case under § 1112 because (1) there is no reasonable likelihood that a plan can be confirmed; and (2) there is loss to the estate and an absence of a reasonable likelihood of rehabilitation. See Supplemental Motion to Dismiss, Dckt. No. 153 (Jan. 8, 2009). "[T]he court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate if the movant establishes cause . . . ." 11 U.S.C. § 1112(b)(1). Section 1112(b)(4) contains a list of factors that may constitute "cause." "[T]he burden is on the movant to establish by a preponderance of the evidence that cause justifying either conversion or dismissal of the case exists." In re Pensignorkay, Inc., 204 B.R. 676, 680 (Bankr.E.D.Pa. 1997); see also In re Bal Harbour

---

the due diligence period, a limited liability company owned by Tucker conveyed title to a 1,634 acre tract of land on the west side of the CSX Railroad with frontage on U. S. Highway 17, land which has become critical in obtaining PUD approval. Tucker's LLC was granted an option to repurchase that tract in paragraph 11 of the agreement. See Movant's Exhibit 50. Later, when the closing of the loan with Canpartners took place, his LLC still held that option, but had not recorded it, meaning in plain terms, it could not have been discovered by a search of the public records. The trial record is not clear whether Canpartners could have discovered this option in some other manner as part of its due diligence or made a sufficient effort to do so. It is clear, however, that at the moment of closing, Tucker was in breach of this obligation to Canpartners, and that Canpartners lost the opportunity to include that option, which is critical to the success of the development, in its collateral package.

Club, Inc., 316 F.3d 1192, 1195 (11th Cir. 2003).

Under 11 U.S.C. § 1112(b)(4)(A), cause for dismissal exists when there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." This is a two-fold inquiry. First, this Court must determine whether there has been substantial or continuing loss to or diminution of the estate. Second, if the Court finds that there is, then this Court must determine whether there is an absence of a reasonable likelihood of rehabilitation. In re Citi-Toledo Partners, 170 B.R. 602, 606 (Bankr.N.D.Ohio 1994).

### a. Substantial or continuing loss to or diminution of the estate

To determine if there is a continuing loss to or diminution of the estate, the Court must fully evaluate the present condition of the Debtor's estate and look beyond financial statements. In re Motel Prop., Inc., 314 B.R. 889, 894 (Bankr.S.D.Ga. 2004)(Davis, J.). "The purpose of §1112[d](1) is to 'preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'" Loop Corp. v. United States Trustee, 379 F.3d 511, 516 (8th Cir. 2004) *cert. denied* 543 U.S. 1055, 125 S.Ct. 915, 160 L.Ed.2d 778 (2005).

That there has been a continuing loss to or diminution of the estate can hardly be disputed. As of the May 6, 2008 petition date, I held that the value of the Vallambrosa property was $35,350,000.00. Interim Order, Dckt.No. 244, pg. 28 (Mar. 27,

AO 72A
(Rev. 8/82)

9

2009). On the petition date, Canpartners was owed $27,691,273.19. *See* Claim No.6. If the property had been sold at that time, the proceeds could have easily paid the secured creditors and the unsecured creditors in full.[5] However, on April 20, 2009, the date of the final hearing, Canpartners' debt had increased to approximately $34,781,000.00. Assuming the value of the property has been stable,[6] Debtor then had approximately $569,000.00 in equity. That number would pay the unsecured creditors only a fraction of what they could have earlier received. The interest on Canpartners' loan is accruing at a rate of $16,315.00 per day or $489,450.00 per month. Thus, by the end of May 2009, there will be no equity in the property, and the unsecured creditors would have no source for any recovery. As a result, there has been a substantial diminution of the estate.[7] *See* In re Avis, slip op., 2008 WL 5786807, at *2 (Bankr.E.D.Va. Nov. 13, 2008).

In addition, accumulating administrative expenses are eroding the position of the estate's creditors and further diminishing the value of the estate. Debtor has ceased business operations and has no money on hand to pay administrative expenses. Furthermore, as explained above, Debtor will soon have no equity in the property. Thus, though Debtor's contention that any real estate development will inevitably have a negative cash flow in the

---

[5] According to the claims register, at the time of the petition, Debtor owed $31,297,650.85 in secured debt, $172,551.64 in priority unsecured debt, and $2,181,919.32 in non-priority unsecured debt.

[6] In fact, based on the testimony at trial, the value of the property most likely has decreased since the petition date.

[7] Debtor argues that if Canpartners meets its burden in showing Debtor is incurring diminution of its estate and has no reasonable likelihood of rehabilitation, "this Court must decide whether unusual circumstances exist such that the requested . . . dismissal is not in the best interest of creditors and the . . . estate." Brief, Dckt. No. 253, pg. 13. For the reasons stated in the above paragraph, I conclude that no such circumstances exist and the best interest of creditors is best served dismissing this case immediately.

pre-marketing phase, "any negative cash flow - including that resulting only from administrative expenses-effectively comes straight from the pockets of the creditors." That alone is enough to satisfy the first element of § 1112(d)(1). Loop Corp. v. United States Trustee, 379 F.3d 511, 516 (8th Cir. 2004).

### b. Absence of a reasonable likelihood of rehabilitation

Section 1121(b)(1) is written in the conjunctive; therefore, it requires both a loss to or diminution of the estate and an absence of a reasonable likelihood of rehabilitation. Rehabilitation "contemplates the successful maintenance or re-establishment of the debtor's business operations . . . " Loop Corp. v. United States Trustee, 290 B.R. 108, 113 (D.Minn. 2003) aff'd 379 F.3d 511 (8th Cir. 2004) cert. denied 543 U.S. 1055, 125 S.Ct. 915, 160 L.Ed.2d 778 (2005); see also In re AdBrite Corp., 290 B.R. 209, 216 (Bankr.S.D.N.Y. 2003); In re Vallambrosa. Companies, 274 B.R. 721, 725 (Bankr.N.D.Ohio 2002)("Rehabilitation . . . means 'to put back in good condition; re-establish on a firm, sound basis.'" citation omitted)). Determining whether there is a likelihood of rehabilitation is not a "technical [test] of whether the debtor can confirm a plan, but rather, whether the debtor's business prospects justify continuance of the reorganization effort." In re Original IFPC S'holders, Inc., 317 B.R. 738, 742 (Bankr. N.D. Ill. 2004). Nevertheless, rehabilitation in a Chapter 11 begins with a confirmable plan. It then requires, at minimum, the prospect of re-establishment of a business. See Loop Corp., 379 F.3d at 518; Loop Corp., 290 B.R. at 113-14.

I find that Debtor has not advanced a plan which is confirmable, even if Tucker does contemplate re-establishing Debtor as an operating company. Debtor's plan offers three alternatives, the first of which, "Settlement," is not in prospect. *See* Stipulated Exhibit K, pgs. 28-29 (August 4, 2008). The next, "Cramdown Alternative One," involves closing a $5 million priming loan (plus taxes, marketing expenses and two years' interest), with priority over Canpartners' loan, to develop sixty marsh front lots and provide the infrastructure for the entire "500 acre core" of the project followed by sale of the remaining tracts or parcels of land to other land developers for an amount sufficient to pay off the Canpartners claim within twenty-four months of the confirmation date. Id., at pgs. 29-41. The third, "Cramdown Alternative Two," would involve Debtor's transfer of portions of the Vallambrosa tract, but less than the entirety of the tract, to Canpartners in return for credit amounts established by the Court that would extinguish the Canpartners claim, a plan which is sometimes referred to as an "eat dirt" or "dirt for debt" reorganization cramdown plan. Id. at pgs. 41-42.

For the following reasons, none of the versions of Debtor's plan is confirmable, thus there is no likelihood for Debtor's rehabilitation. First, "[p]rojections of the income necessary to finance a plan of reorganization must be based on concrete evidence of financial progress and must not be speculative, conjectural or unrealistic." In re Fort Knox Mini Warehouse, Inc., 2002 WL 1842452, at *6 (Bankr.N.D.Iowa, July 31, 2002).

Debtor's proposed $5 million priming loan is unrealistic. In his deposition,

which was admitted in evidence in lieu of his cross-examination, Tucker testified that he had talked to three lenders about financing the $5 million priming loan. *See* Amended Deposition Designations, Dckt.No. 216, pg. 15 (Feb. 26, 2009). With all three lenders, he only had preliminary discussions and did not discuss any terms for the loan. Id. at pg. 16-19. Furthermore, during his direct examination at the hearing, Debtor could not identify with specificity any lender willing to advance him a $5 million priming loan. *See* In re Coleman, 288 B.R. 608, 612 (Bankr.S.D.Ga. 2002)(Davis, J.)(finding grounds for dismissal in part because plan is wholly dependent upon an outside investor who has no binding commitment to participate and Debtor could not establish his ability to raise the necessary capital.).

The only other evidence of availability for financing of projects such as this came from Richard Gaudet of Glass Ratner Consultants. He has twenty-five plus years of experience in banking, financial advising and consulting. He is generally familiar with the current state of capital and credit markets in the commercial and mortgage lending arena. He has extensive experience dealing with undeveloped real estate and troubled loans. He reviewed Debtor's plan, disclosure statement, the appraisals of both experts, the PUD documents and master plan, and lot sales activity in the five county area near the property. Mr. Gaudet testified persuasively that the current market for property like Vallambrosa is very distressed, has been since early 2007, and that there is simply too much excessive inventory of undeveloped or partially developed land for a conventional lender to advance more funds.

In light of this distressed market, Mr. Gaudet testified that the only source of funds would be a nonconventional lender who would look for internal rates of return of twenty-five percent or higher, which over a fairly short repayment period would run the cost of the $5 million loan to nearly $7 million. He concedes that it would be possible for Debtor to find a lender for a project similar to this at some cost, but such a lender would only take the risk if it believed that Canpartners, the current first lienholder, would step in and pay off the first mortgage if there were a default. Since he believes there is substantial risk of default and Canpartners has stated it would not consent to such an arrangement, Mr. Gaudet testified he believed that no nonconventional lender would make such a priming loan in this environment.

Mr. Gaudet's testimony was persuasive, and taking it and Mr. Tucker's testimony together, I conclude that finding a $5 million priming loan is not feasible. However, even in the unlikely event that the funds could be borrowed, Debtor's plan to subordinate Canpartners' debt to that loan still could not be approved. As of May 6, 2008, I held that the value of the Vallambrosa property was $35,350,000.00. <u>Interim Order</u>, Dckt.No. 244, pg. 28 (Mar. 27, 2009). On April 20, 2009, the date of the final hearing, Canpartners was owed approximately $34,781,000.00. The evidence taken as a whole shows that, at best, the property value is unchanged since May 6, 2008, but more likely has shrunk. Without an equity cushion of $5-7 million, Debtor cannot provide adequate protection under 11 U.S.C. § 364(d)(1)(B) for the subordination of the Canpartners loan.

Second, there is no likelihood of rehabilitation because the plan envisions an unrealistically short sell-out period. It provides that Debtor would pay Canpartners' claim in full within twenty-four months of the confirmation date. However, Mr. Crisler, the appraiser whose methodology I adopted in the Interim Order, concluded that an investor would project an 18-36 month period prior to there being "adequate demand" to commence this type of development. Movant's Exhibit 56, pg. 36. His conclusions concerning market conditions were based on data showing that sales, which were strong through 2006, began to "slow significantly" by early 2007. Id. at pg. 30. Indeed the graph of lot sales and building permits showed a precipitous decline from 2006 to 2007 to early 2008. Id. at pg. 31. He concluded that there was an oversupply of lots and finished homes and that supply and demand equilibrium might not occur for 18-36 months or longer. Similarly, Rob Lee, the project manager for the Vallambrosa development, testified that on a forward looking basis, obtaining approval of local zoning and a Federal Section 404 permit would take a minimum of twelve months prior to any developer having the ability to construct the necessary roads and other infrastructure. He projected no less than twenty-four months before lots could actually be offered for sale for immediate construction. In light this testimony, the lots could never sell-out in twenty-four months. However, if Debtor does not pay Canpartners' claim in full by the end of the twenty-four month period, Debtor's plan proposes that the property would be auctioned off. Id. at pg. 33. Because the development timetable guarantees that lot sales could not commence in time to meet the twenty-four month deadline, there is no basis to expect anything other than an auction sale two years hence. There is no defensible basis to delay the inevitable.

Third, this alternative is not feasible because it provides that Debtor "will obtain the U.S. Highway Easement, and will deliver at the Confirmation Hearing, as a condition of confirmation of the Plan, a properly surveyed and engineered U.S. Highway 17 Easement in recordable form." Stipulated Exhibit K, pg. 29, and that the connector road between Vallambrosa and U.S. Highway 17 "will be constructed at the expense of the City of Savannah." Id. at pg. 32. This cannot happen for the following two reasons. First, Debtor does not have the cash to purchase the easement, the $5 million priming loan does not cover the purchase price, and there is not enough equity in the property to cover the purchase price. Second, Rob Lee testified that the City of Savannah would only fund the construction of the connector road if a hotel were built on the Vallambrosa property. He testified that as of the date of the hearing, no deal has been or is likely to be reached with any hotel company and there was no evidence from any source to suggest he is incorrect.

Debtor proposed another alternative, "Cramdown Alternative Two" that would involve transferring portions of the Vallambrosa tract, but less than the entirety of the tract, to Canpartners in return for credit amounts established by the Court that would extinguish the Canpartners claim. This alternative will not lead to Debtor's rehabilitation because Debtor will have no equity in the property by the end of May 2009. As described above, Debtor only had approximately $569,000.00 in equity on April 20, 2009. However, the interest on Canpartners' loan is accruing at a rate of $16,315.00 per day or $489,450.00 per month. To obtain confirmation of the plan, Debtor must have his disclosure statement approved, a process which requires a minimum twenty-five day notice period to interested

parties. After notice and a hearing, the Court must approve the disclosure statement and then provide for ballots to be sent to creditors, followed by a confirmation hearing normally set not less than thirty-five days later. Therefore, the shortest time in which confirmation could occur is approximately 60-90 days hence. The plan provides that 80 days after the confirmation date, Debtor will file a notice of intention that it will transfer the property. *See* Id. at pg. 14 & 39-40. In light of how this case has progressed thus far, these events are highly unlikely to occur on schedule. But even if they do, over that five to six month period, another $3 million in debt will accrue, leaving Canpartners with at least a $3 million deficiency based on the value I have set.

Although Debtor argued that it could have the property appraised in segments or parcels rather than as a whole and that he believed the aggregate value of the individual parcels would exceed the value of the whole, I reject that suggestion. All the evidence, including Tucker's testimony, shows that the tract is unique in size and location and that its value is enhanced by the assemblage of such a large and unique tract for planned development. The weight of the evidence clearly supports my finding that the value of the tract would be diminished rather than enhanced if it were broken up.[8] While I have heard no evidence, nor ruled on the precise value the land has today, or may have six months hence, I conclude that, based on current conditions and the proposed breakup of the tract, its value will be no greater, and probably less, than the May 2008 value. For these reasons,

---

[8] In fact, both appraisers stated that highest and best use of the property as vacant land is the development of a residential subdivision. Neither appraiser stated the highest and best use of the property was dividing up the land and selling it in pieces. *See* Debtor's Exhibit 36, pgs. 129-132; Movant's Exhibit 56.

Canpartners has shown that Debtor has no reasonable likelihood of confirmation of a plan, which is an essential element of "rehabilitation."

## ORDER

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that this Chapter 11 case is DISMISSED.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 21st day of May, 2009.