# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

| | | |
|---|---|---|
| In the matter of: | ) | |
| | ) | Chapter 11 Case |
| VALLAMBROSA HOLDINGS, L.L.C. | ) | |
| | ) | Number <u>08-40791</u> |
| *Debtor* | ) | |
| | ) | |
| | ) | **FILED** |
| | ) | **Samuel L. Kay, Clerk** |
| CANPARTNERS REALTY HOLDING | ) | **United States Bankruptcy Court** |
| COMPANY IV, L.L.C. | ) | **Savannah, Georgia** |
| | ) | **By lbarnard at 11:19 am, Jun 18, 2009** |
| *Movant* | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VALLAMBROSA HOLDINGS, L.L.C. | ) | |
| | ) | |
| *Respondent* | ) | |

### MEMORANDUM AND ORDER
### ON VALLAMBROSA'S MOTION TO RECONSIDER DISMISSAL
### PURSUANT TO BANKRUPTCY RULES 9023 AND 9024

#### FINDINGS OF FACT

Debtor's case was filed May 6, 2008, on the morning of a scheduled

foreclosure over a large tract of land it was developing known as Vallambrosa Plantation

("Vallambrosa") in Chatham County, Georgia.  Movant Canpartners Realty Holding

Company IV, L.L.C. ("Canpartners") had advanced a loan in 2006 in the amount of

approximately $28 million secured by the Vallambrosa real estate.  The loan matured in March 2008 by terms of the Note.  Canpartners also declared default pursuant to other terms of the loan agreement ("Agreement") and accelerated the repayment obligation in the Note. Movant's Exhibit 31; Respondent's Exhibit 177 (April 1, 2008).

On March 27, 2009, this Court entered an Interim Order on Canpartners' Motion to Dismiss, establishing the value of the Vallambrosa tract as of the petition date at $35,350,000.00.  Interim Order, Dckt. No. 244, pg. 28.  After final arguments on the Motion to Dismiss, this Court entered a Final Order on May 21, 2009, dismissing Debtor's Chapter 11 for its lack of good faith in filing its case and for "cause" under 11 U.S.C. § 1121(b)(1) because there was diminution of the estate and an absence of a reasonable likelihood of rehabilitation.  Final Order, Dckt. No. 258.  On June 1, 2009, Debtor filed this Motion to Reconsider the Dismissal of its case.  Motion, Dckt. No. 262.

## CONCLUSIONS OF LAW

Federal Rule of Bankruptcy Procedure 9023, which incorporates Federal Rule of Civil Procedure 59, states:

> (a)(1) The court may, on motion, grant a new trial on all or some of the issues - and to any party - as follows:
> . . . .
> (B) after a nonjury trial, for any reason for which a new trial has heretofore been granted in a suit in equity in

2

federal court;

(2) After a nonjury trial, the court may, on motion for a new trial, open judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.
. . . .

(e) A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment.[1]

"The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." In re Kellogg, 197 F.3d 1116, 1119 (11th Cir. 1999)(citation omitted); Sherrod v. Palm Beach County Sch. Dist., 237 Fed.Appx. 423, 424 (11th Cir. 2007). Rule 59(e) may not be used "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." Michael Linet, Inc., v. Vill. of Wellington, Fla., 408 F.3d 757, 763 (11th Cir. 2005); see also Mincey v. Head, 206 F.3d 1106, 1137 n.69 (11th Cir. 2000).

In its Motion to Reconsider, Debtor asks this Court: (1) to alter and amend finding on page 11 of the Interim Order that by December 15, 2007, the PUD submission would be "eight months late;" (2) to alter and amend the recitation of evidence on page 14

---

[1] Debtor also brings its Motion for Reconsideration pursuant to Federal Rule of Civil Procedure 60 as incorporated by Federal Rule of Bankruptcy Procedure 9024. However, Debtor only invokes Rule 59 in the body of its Motion, and this Court finds the relief sought is properly characterized as a Rule 59 motion to alter or amend the judgment.

3

AO 72A
(Rev. 8/82)

of the Interim Order respecting Debtor's option to purchase property between the West Side of the CSX Railroad and U.S. Highway 17, and to open judgment and admit as evidence the Financial Statement of Jewett Tucker dated "as of 6/13/06;" (3) to alter and amend findings of fact set forth in the Final Order on pages 7 through 8 and also footnote 4; and (4) to alter and amend the findings of fact and conclusions of law in the Final Order that Debtor filed its petition with a lack of good faith, or that there was continuing loss and an absence of reasonable likelihood of rehabilitation. Debtor also asks this Court to alter and amend its conclusions in the Final Order on pages 16-18 that Debtor's plan proposing a "Cramdown Alternative Two" is not confirmable resulting in dismissal for cause under 11 U.S.C. § 1112(b)(4)(A).

Debtor's Motion does not expose any manifest errors of law or fact or present any newly discovered or previously unavailable evidence. As a result, Debtor's Motion for Reconsideration could immediately be dismissed. Nevertheless, I will take this opportunity to address some of the issues raised in order to clarify my prior rulings.

## I. Mutual Departure

In its Motion, Debtor "seeks an Order amending this Court's finding in the Interim Order at page 11, that by December 15, 2007, a submission of the PUD would have been eight months late." Motion, Dckt. No. 258, pgs. 11-13. Furthermore, Debtor asks that the following sentence be deleted from footnote 4 on page 7 of the Final Order: "The

4

Maturity Date of the loan expired after Debtor repeatedly failed to timely perform contractual duties and meet development deadlines agreed to at the inception of the loan, as discussed in my earlier order." Id., pgs. 18-19.  Debtor argues that the subsequent "acts, conduct and agreements of the parties" after the closing of the loan show that "the parties mutually departed from the initial contract terms, and specifically agreed to change the scope of predevelopment activities, the money which would be funded during the predevelopment stage, and the timeline for performance." Id., pg 13, ¶ 14-17.

In my previous two orders, I considered the parties' subsequent behavior in light of this argument advanced at trial, decided that Debtor's mutual departure argument had not been proven, and determined it need not be addressed in my final order which was lengthy and dealt with numerous issues.  In light of the Motion, I now take this opportunity to deal expressly with this issue.

Georgia Code § 13-4-4 states:

> Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement.  The contract will be suspended by the departure until such notice.

5

"For a departure from the terms of a contract to be sufficient to require notice by one of the parties of the intention to insist upon strict compliance with the contract, the departure must be mutual and intended, such that the parties have essentially entered into a new agreement concerning the requirements of the original contract." Duncan v. Lagunas, 253 Ga. 61, 62, 316 S.E.2d 747, 748 (Ga. 1984)(*citing* Cont'l Cas. Co. v. Union Camp Corp., 230 Ga. 8, 11, 195 S.E.2d 417 (Ga. 1973))(other citation omitted); *see also* Guideone Life Ins. Co. v. Ward, 275 Ga. App. 1,3, 619 S.E.2d 723, 726 (Ga.Ct.App. 2005); Handex of Fla., Inc., v. Chatham County, 268 Ga.App. 285, 288-89, 602 S.E.2d 660, 663-64 (Ga. Ct.App. 2004). Whether the conduct of the parties results in a mutual departure from and waiver of a contract provision is generally a question of fact. Hopper v. M & B Builders, Inc., 261 Ga. App. 702, 705, 583 S.E.2d 533, 537 (Ga. Ct. App. 2003).

Although Debtor may have unilaterally interpreted Canpartners' behavior as a waiver of the necessity to strictly comply with the specified development schedule contained in the Agreement, there is no evidence that that was Canpartners' intention.

Section 5.2(b) of the Agreement requires Debtor to proceed in accordance with the project schedule. As early as February 5, 2007, Canpartners sent a letter to Debtor alleging Debtor's default in the project schedule. It stated that that was an immediate event of default and reserved its rights under the Agreement, but also stated that it was "willing to continue to disburse funds from the Reserve Accounts pursuant to Article 8 of the Loan

6

Agreement" but did "not wish to waive, and hereby reserves, all rights under Section 5.2(b) of the Loan Agreement."  Movant's Exhibit 26, pgs. 1-2.[2]  Canpartners' intention going forward, as evidenced by this letter, was to work with Debtor as it attempted to cure its defaults under the project schedule.  Debtor's argument that Canpartners' later approval of several draw requests evidences a mutual departure is directly contradicted by this letter.  *See* Duncan v. Lagunas, 253 Ga. at 62-3 (found no mutual departure despite lender's acceptance of several late payments since lender had orally expressed its displeasure with the borrower's late payments).

Furthermore, in all its correspondence with Debtor after this February 5, 2007, letter, Canpartners always reserved its rights and remedies under the Agreement, and at times expressly stated that its correspondence "shall not constitute a waiver by Lender in any Event of Default or breach that may now or hereafter exist or occur under the Loan Agreement and other Loan Documents." January 18, 2008 Letter, Movant's Exhibit 28; *see* April 13, 2007 Letter, Movant's Exhibit 27; February 29, 2008 Letter, Movant's Exhibit 29; March 18, 2008 Letter, Stipulated Exhibit M; April 1, 2008 Letter, Movant's Exhibit 31; May 5, 2008 Letter, Movant's Exhibit 32.

---

[2]  In fact, in an April 13, 2007, letter, Canpartners acknowledged receipt of, but never agreed to two revised project schedules from Debtor.  Movant's Exhibit 27.  No revised development schedules after the date of this letter were admitted into evidence.  Therefore, I find that Canpartners never accepted a revised project schedule from Debtor.  *See* Movant's Exhibit 27.

7

Roth and Downes' testimony describing the July 26, 2008, meeting also revealed nothing to contradict this intention. Instead, the testimony is consistent with this Court's conclusion that Canpartners' intent at all times was to continue to work with Debtor to cure the defaults under the project schedule but in no way was waiving its rights to enforce Section 5.2(b) of the Agreement.[3]

Finally, any discussions between the parties having to do with the project schedule would have no effect on the maturity date or any other provisions in the Agreement. A mutual departure from one contract term does not affect the enforceability of the other contract terms. Hopper v. M & B Builders, Inc., 261 Ga. App. at 705; SW Plaster & Drywall Co. v. R.S. Armstrong & Bros. Co., 166 Ga. App. 373, 374, 304 S.E.2d 500, 501 (Ga. Ct. App. 1983)(citing State Mut. Ins. Co. v. Strickland, 218 Ga. 94, 126 S.E.2d 683 (Ga. 1962)); see also United States v. Salzillo, 694 F.Supp. 1560, 1562 (N.D.Ga. 1988). Therefore, even if the parties mutually departed from the project schedule under the Agreement, all other provisions including the maturity date (and other default events in the Agreement) would still remain intact.

Debtor introduced no evidence that Canpartners ever agreed to waive or modify the maturity date or any other provisions in the Agreement. In fact, Canpartners sent

---

[3] All the underlying loan documents also provided for future reservation of rights and non-waiver. See Loan Agreement, Stipulated Exhibit B, pg. 65, ¶ 11.1; Promissory Note, Stipulated Exhibit C, pgs. 7-8, ¶ 3.5 and 3.8; Deed to Secure Debt, Stipulated Exhibit D, pg. 34, ¶ 10.1 & pg. 36, ¶ 10.5 & 10.8.

a letter to Debtor on February 29, 2008, several weeks prior to the March 29, 2008, maturity date, detailing that maturity of the loan was fast approaching and explaining the requirements established by the Agreement for extending the maturity date. *See* Movant's Exhibit 28.

For these reasons, Debtor's argument that this Court should have found that the parties had mutually departed from the development schedule is without merit.

## II. The Option to Purchase

This ground of Debtor's Motion argues that a document delivered to the Court in chambers, following the testimony of Roth by Canpartners, in the presence of Debtor's counsel, impeaches or contradicts the testimony of Roth. Debtor believes the Court relied on Roth's testimony, in the absence of this evidence, in reaching certain conclusions about option property which Tucker held directly or indirectly at closing which constituted a breach of one of the covenants in the Agreement. *See* Motion, Dckt. No. 262, pgs.14-17.

A document was indeed delivered to this Court in chambers by Canpartners' counsel in the presence of Debtor's counsel after the close of the evidence but before final oral arguments and before the Court's entry of both the Interim and Final Orders. It is entitled "Personal Financial Statement of Jewett W. Tucker, Jr." It is dated June 13, 2006, and under Schedule 7, "Partially Owned Real Estate," it lists "Options to purchase land 1500

9

%AO 72A
(Rev. 8/82)

acres, Savannah, GA" valued at $76 million with a net value of $64 million.  It also lists "1630 acres Savannah, GA - Kingsbrrry Plantation" with a net equity of $4,550,000.00.

In the Motion, Debtor takes the position that this financial statement had put Canpartners on notice of the existence of the option, that the document was withheld from production by Canpartners, that I should reopen the evidence to admit the document, and that this Court should conclude that Canpartners had actual knowledge of the existence of this option. Id.  That conclusion, if adopted, presumably would lead Debtor to argue that when Tucker signed the Agreement warranting, untruthfully, that Debtor, he, nor any other affiliates owned other real estate, including option rights, "directly or indirectly" in Chatham County, Canpartners knew he was lying. See Stipulated Exhibit B, ¶ 4.7, pgs. 21-22. The existence of this document  potentially has the effect of impeaching or diminishing the testimony of Roth that, to the best of his recollection, Tucker had not disclosed the existence of that option during the due diligence period and, that if he had,  Roth would not have closed the loan without the option property being included in his collateral package.

A close reading of footnote four at pages 7-8, however, reveals that I did not make a factual finding that Tucker failed to disclose this option interest.  Such non-disclosure would clearly contribute to a finding of a lack of good faith filing, but I did not reach that conclusion then or now.  Instead, what I observed was that the option interest held by  Tucker on the date of the closing had not been recorded "meaning in plain terms, it could not have

10

been discovered by a search of the public records." I went further: "the trial record is not clear whether Canpartners could have discovered this option in some other manner as part of its due diligence or made a sufficient effort to do so." Those two statements are correct.

The next sentence is neither dependent upon nor rendered erroneous by the existence of the document, and I reaffirm "[i]t is clear, however, that at the moment of closing, Tucker was in breach of this obligation to Canpartners, and that Canpartners lost the opportunity to include that option, which is critical to the success of the development in its collateral package." The loan documents clearly reveal that Canpartners required Debtor to pledge all property Tucker or Debtor owned directly or indirectly in Chatham County, including "option rights," to secure the promissory note. Tucker signed the loan agreement which affirmatively represented that Canpartners held all such property. Since it did not acquire the option property at closing, Debtor breached that covenant.

Furthermore, I deny the request to reopen the evidence and admit this financial statement. When the document was delivered to me and I had an opportunity to review it, it raised many questions about whether Canpartners' contention that Tucker had concealed this asset was in fact correct. The document was delivered on March 9, 2009. Counsel for both parties argued its meaning in Final Argument even though it was not in the record. This Court's Interim Order was entered on March 27, 2009, and this Court's Final Order was entered on May 21, 2009. At no time after March 9, when this document came

11

to light, did any party request that the Court reopen the evidence in order to admit it or to take further testimony on what the document means.  Insofar as I know, both parties may have simply made the tactical decision that reopening the evidence for this purpose might adversely affect their case in unforeseen ways and simply elected not to make that request, being satisfied with the then current state of the record.  If that is what happened, it would be no different than any of the many tactical decisions made by experienced trial counsel which are made frequently in litigation concerning what evidence to advance and what evidence to bypass in order to maintain a coherent and persuasive case.[4]  All I know is that no such request was made until after I ruled, and the party who now feels that it may have been harmed by the absence of this document from the record wants to reopen the evidence after the fact.

I reject that request because it is untimely, could have been made at a time before the Court ruled, and because as I have outlined above, the Order, given a careful reading of my conclusions, did not rely on any contention that Tucker actively concealed the option prior to the closing.  At the risk of repeating myself, I simply held that he stood in breach of contract covenants when he closed the loan while holding an option interest, whether it had been previously revealed or not, and I stand by that finding.  *See* Mays v. United States Postal Serv., 122 F.3d 43, 45-6 (11th Cir. 1997)("where a party attempts to

---

[4] Indeed in this case, which consumed hundreds of pages of transcript, eight days of trial, and over 200 marked exhibits (some duplicated), fewer than 100 were ultimately admitted.

12

introduce previously unsubmitted evidence or a motion to reconsider the court should not grant the motion absent some showing that the evidence was not available during the pendency of the motion.").

Last, Debtor makes the additional argument that the Court was in error in reaching the conclusion that Debtor was in breach of the above covenant because at the time of the closing, the option over this tract had been transferred to Buddy Glawson, a person who provided financing to Tucker from time-to-time secured by transfers of option rights. Motion, Dckt. No. 262, pg. 17, ¶ 21. It is correct that Tucker testified in that manner, saying that he had engaged in transactions like this with Buddy Glawson on occasions "too many to count." He testified that he did not own this tract or a smaller 31 acre tract on the date of closing because of the assignment of this option right.

Upon further review of that testimony, I still conclude that he had a property interest he was obligated to reveal to Canpartners at the moment of closing and that in failing to do so, he stood in breach of the contract for the following reasons: (1) Tucker blandly asserted but provided no documentation or other corroborating evidence that the assignment ever occurred and there was no evidence of recordation of any such assignment. (2) Tucker testified that his assignments to Glawson were not absolute assignments, but were collateral assignments to secure advances made by Glawson to him. As a result, Tucker had not irrevocably parted with an interest in the real estate. Rather, his real estate option was simply

13

subject to an obligation to repay Glawson. (3) Several options were paid off at closing. Indeed, Glawson is shown as the recipient of $155,142.10 at the closing as "balance due to Glawson's Investment Corp., (option)." (4) Paragraph 11, part B, of the original sale and purchase agreement of the 1,634 acres and option back states that Tucker as owner of Kings Ferry Plantation, L.L.C., may only assign the option upon written consent of Rob Lee through Bradley Boulevard, L.L.C. *See* Movant's Exhibit 50. No written document was provided, nor did Rob Lee testify, that such permission was given. (5) The initial option in favor of Tucker expired on January 19, 2007. As Exhibit 50 reveals, Tucker executed amendments to the option, after closing the Canpartners' loan, over this tract of land from Bradley Boulevard, L.L.C.[5] To the extent his testimony can be credited with establishing that he had assigned that interest as collateral prior to the date of closing, his continuing transactions with Bradley Boulevard following that date day lay to rest any notion that his assignment for collateral purposes stripped him of any residual real estate interest. The retention of that interest constituted a breach of the loan document covenants. I therefore reaffirm my holding on this point.

### III.  Absence of Reasonable Likelihood of Rehabilitation

Vallambrosa seeks altered or amended findings of the issue of whether there is an absence of a reasonable likelihood of rehabilitation. *See* Motion, Dckt. No. 262, pgs.

---

[5]  Tucker extended the option on December 28, 2006, and June 29, 2007.

14

25-29. The essence of Debtor's argument is two-fold. First, that for the purposes of confirmation of a plan, which is an essential element, although not perhaps the only element in rehabilitation, the valuation date of the property would be the effective date of the plan. Debtor contends that the Court has no evidentiary basis to support a finding that on the effective date of any plan what the value of the property might be at that date. Accordingly, he believes that I erred when I concluded that there was insufficient value in Debtor's real estate to consummate Cramdown Alternative Two, a "dirt for debt" plan with Debtor retaining any excess real estate.

It is true that the Court did not hear evidence what the particular value of this property will be as of the effective date of the plan nor did I make any precise finding as to what that value would be in the absence of hearing such testimony. What I did conclude, however, was that as of April 20, 2009, the date of final argument in this case, Debtor had only $569,000.00 in equity remaining based on the value of the property as of the May 2008 filing date. With an interest accrual of just slightly under a half a million dollars per month, I found that Canpartners' debt would exceed that value prior to the time that any plan could be confirmed some five to six months in the future. At the time of any such confirmation hearing, approximately another $3 million in debt would accrue resulting in a large deficiency on the Canpartners' claim. I also concluded that Debtor's suggestion that the property could be appraised in segments or parcels, rather than as a whole, would result only in a diminished value rather than an enhancement, based on all the evidence I had heard

AO 72A
(Rev. 8/82)

in the case. I further concluded that based on the totality of the evidence, the real estate market is even worse at present than it was in May 2008 and that the value I established as of that date would be "no greater and probably less." I reaffirm those holdings and conclude that they are sufficient, even in the absence of the setting of a precise value six months hence, for me to conclude that there is an absence of any reasonable likelihood of rehabilitation.

The second prong of Debtor's argument, however, is that Debtor believes that there is additional value in the tract concerning possible mitigation credits, a claim which I heard no evidence at trial, but which he claims he can produce at any future hearing on confirmation of his Cramdown Alternative Two. He argues that after hearing that evidence, I will conclude that there may be as much as $10 million or more in additional value in this tract of land. This contention is based upon Debtor's belief that portions of the Vallambrosa property could be utilized as a mitigation bank or for the sale of mitigation credits to meet statutory and regulatory requirements for development of property in coastal Georgia.

In the weeks leading up to the trial, and indeed throughout the trial, Debtor had taken the position that this enhanced value existed and two expert witnesses at trial would establish that value. Those same witnesses had produced a report during the pre-trial phase of the case, which was marked but never admitted into evidence, and their depositions had been taken but were never submitted. Despite the fact that they were present for at least some portions of this lengthy trial, Debtor's counsel ultimately announced that their

16

testimony would not be offered. For that reason, obviously, I attached no additional value to the Vallambrosa tract based on any notion that it might have value as a mitigation bank or for the sale of mitigation credits. Now, however, Debtor argues that my conclusions concerning absence of a likelihood of rehabilitation is erroneous because I have not yet heard that evidence.

It is probably correct to observe here that, if the mitigation bank or mitigation credit value is something on which Debtor intended to rely in defense of the motion to dismiss which directly raised the question of a reasonable likelihood of rehabilitation, that that evidence should have been presented at the time of the trial and to interject it at this time is simply untimely. *See* <u>Sanderlin v. Seminole Tribe of Fla.</u>, 243 F.3d 1282, 1292 (11th Cir. 2001)("Motions for reconsideration should not be used to raise legal arguments which could and should have been made before the judgment was issued."). However, it is not necessary to dismiss this contention on this narrow ground because of the terms of Debtor's proposed plan as explained at closing arguments.

While the written terms of the plan were concise and fairly generic, I specifically raised with Debtor's counsel during closing argument in a rather detailed colloquy the issue of exactly what Debtor's plan under that Cramdown Alternative Two would look like. As explained in closing arguments, Debtor's plan, as it was then understood, consisted of Debtor conveying all of the Vallambrosa tract to Canpartners in full

17

satisfaction of its debt with the following exceptions.   Debtor intended to retain approximately fifty acres of upland property (in the vicinity of tracts R-13 and 14 on the last page of Stipulated Exhibit N), plus all the marshes and all the wetland areas in the Vallambrosa tract.

The obvious result is that whether the mitigation bank or mitigation credits have any value at all or whether they are worth $10 million or more as Debtor now contends,[6] this is value Debtor intended to retain under his plan.  Debtor did not intend to convey any of this mitigation value to Canpartners to satisfy its claim.  To the contrary, Debtor intended to convey only what was left after this portion of the tract was carved out.  As a result, no matter what the evidence as to the value of these mitigation credits may be, it would not form the basis of my reaching any different conclusion than I did in the original order, to wit: Whatever the precise value of the tract might be, there is insufficient value in the property which Debtor intended to convey to Canpartners to pay its debt, including accrued interest, in full, and thus there is no reasonable likelihood of rehabilitation.

## CONCLUSION

Ultimately, Debtor seeks an order from this Court reversing itself on both bases for dismissal.  I reaffirm both of the separate, independent, and sufficient grounds for

---

[6]  It must be noted that Canpartners strenuously disputed the notion that there was any additional value added to the tract based on mitigation bank value or the sale of mitigation credits and had an expert poised to provide evidence on this issue.

dismissal.  In this Order, I have addressed at length some of the more specific underlying reasons for my conclusion.  I need say nothing further other than to observe that based on the totality of the record in its entirety, and not limited by the four corners of my discussion of the evidence in my orders, I have come to the inescapable conclusion that the case should be dismissed.

I understand that Debtor does not like the outcome, quarrels with some or all of its reasoning, and parses certain phraseology in the orders to establish a foothold, small as it may be, to bootstrap an argument that I have ruled in error.  The vehicle for that is not to engage in interminable motion practice in the trial court.  If Debtor is entitled to recourse, it is time to seek appellate review.

## O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the Debtor's Motion to Reconsider Dismissal is DENIED.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 17th day of June, 2009.

19